**PUBLISH**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 11 1997**

**PATRICK FISHER**
**Clerk**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee and Cross-Appellant,

v.

SONIA GALLEGOS,

    Defendant-Appellant and Cross-Appellee.

Nos. 95-2071 &
95-2125

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-92-486-19-JC)**

_____

Charles L. Barth (John J. Kelly, United States Attorney, with him on the briefs), Assistant United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellee and Cross-Appellant.

Vicki Mandell-King (Michael Gordon Katz, Federal Public Defender, with her on the briefs), Assistant Federal Public Defender for the districts of Colorado and Wyoming), for Defendant-Appellant andCross-Appellee.

_____

Before **BALDOCK** and **BRORBY,** Circuit Judges, and **DANIEL,**[*] United States District Judge.

**BRORBY**, Circuit Judge.

---

[*] The Honorable Wiley Y. Daniel, United States District Judge for the District of Colorado, sitting by designation.

_____

A jury convicted Sonia Sierra Gallegos of two criminal counts, conspiracy and money laundering, in the United States District Court for the District of New Mexico. The district court sentenced Ms. Gallegos to seventy months imprisonment. Ms. Gallegos appeals her conviction, and the United States appeals the district court's application of the United States Sentencing Guidelines. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Gabriel Rodriguez-Aguirre ("Mr. Aguirre") managed a family-run organization which specialized in the sale and distribution of large amounts of marijuana and cocaine. *United States v. Denogean*, 79 F.3d 1010, 1011 (10th Cir.), *cert. denied*, 117 S. Ct. 154 (1996). Between 1984 and 1992, the organization sold more than 20,000 pounds of marijuana and over "20,000 pounds of cocaine to narcotics traffickers in New Mexico, Arizona, Utah, Kansas, Massachusetts, and elsewhere throughout the United States." *Id.* The organization used narcotics proceeds to purchase real property and other assets. *Id.*

Ms. Gallegos met Mr. Aguirre in 1989 or 1990 while she was working at

J.C. Penney's in El Paso, Texas. Shortly thereafter, Mr. Aguirre and Ms. Gallegos became romantically involved, and Ms. Gallegos began assisting Mr. Aguirre's attorneys in representing Mr. Aguirre in criminal cases pending against him in Kansas and New Mexico. Ms. Gallegos obtained documents for Mr. Aguirre's attorneys, located and contacted witnesses, and conducted research on behalf of Mr. Aguirre.

On October 19, 1992, the United States filed a civil complaint for forfeiture of property in the District of New Mexico entitled *United States v. Fifty-One Items of Real Property, etc.*, No. CIV 92-1155-JC. Although the complaint named Ms. Gallegos as a claimant of certain property, she did not contest the forfeiture action by filing a claim. Consequently, the United States District Court entered a partial default judgment, in which Ms. Gallegos' interest in the named property was forfeited to the United States. *United States v. Fifty-One Items of Real Property*, No. CIV-92-1155 JC (D.N.M. Dec. 15, 1993).

On October 20, 1992, a federal Grand Jury in the District of New Mexico returned a twenty-three count indictment against Ms. Gallegos and twenty-one other defendants, including Mr. Aguirre. The bill of indictment charged Ms. Gallegos with conspiracy to distribute more than 1000 kilograms of marijuana, in

violation of 21 U.S.C. § 841 (1994), and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Supp. 1996). Ms. Gallegos pled not guilty to the charges against her and proceeded to trial with her co-defendants in January 1994.

The trial of Ms. Gallegos and her co-defendants lasted six months, becoming "the longest federal criminal trial ever held in the District of New Mexico." *United States v. Rodriguez-Aguirre*, 73 F.3d 1023, 1024 (10th Cir. 1996). After deliberating for more than six weeks, the jury was unable to reach a verdict on the majority of counts, and the trial judge declared a mistrial. *Id.* Neither the United States nor counsel for Ms. Gallegos objected to the mistrial.

In August 1994, the United States obtained a superseding indictment against Ms. Gallegos and nine of her co-defendants. In addition to the charges included in the original indictment, the superseding indictment contained new charges against Ms. Gallegos. Count II additionally charged Ms. Gallegos with conspiracy to possess with intent to distribute cocaine, and conspiracy to distribute cocaine. Count XIX additionally charged Ms. Gallegos with receiving income from the distribution of controlled substances, and investing this income

in Amador Investors,[1] in violation of 21 U.S.C. § 854 (1994). Although Ms. Gallegos moved to dismiss the superseding indictment due to vindictive prosecution, the trial court summarily denied her motion.

Prior to trial on the superseding indictment, the district court randomly selected a jury panel of approximately 250 jurors from voter registration lists for the Roswell Division of the District of New Mexico. The district judge excused 132 jurors *sua sponte* after reviewing the juror questionnaires; the court only directed 115 jurors to report for jury service. Six days prior to trial, defense counsel were provided copies of juror questionnaires for the panel that had been selected for service and defense counsel learned the court had excused the remaining jurors.

On November 14, 1994, the first day of trial, Mr. Aguirre filed a motion to stay the proceedings, and defendant David Morales filed a motion to quash the jury venire.[2] The motions alleged the jury venire panel seriously misrepresented

---

[1] Amador Investors was a real estate business Ms. Gallegos and Hector Amador established in 1990. Ms. Gallegos was president of the company and she received a monthly salary from the company.

[2] Pursuant to the court's order that "one motion made by one defense counsel applies to all [defendants]," all of the defendants, including Ms. Gallegos, adopted the motions of Mr. Aguirre and Mr. Morales. (Vol. 11 at 10.)

the ethnic makeup of the District of New Mexico. Specifically, the defendants claimed persons of Hispanic origin and American Indian background were underrepresented. The defendants sought a stay of the trial to allow time for an investigation of the ethnic background of all the jurors. In addition, Mr. Morales' counsel, Paul Kennedy, orally advised the court of *United States v. Calabrese*, 942 F.2d 218 (3d Cir. 1991), which Mr. Kennedy claimed stood for the proposition that it is reversible error for a court to exclude a juror prior to voir dire "simply because a juror knows a defendant." Mr. Kennedy claimed it appeared the court had excused at least one juror because the juror stated he or she knew one of the defendants.

Following Mr. Kennedy's comments, the court held an evidentiary hearing at which Nancy Metzger, jury administrator for the Federal Court Clerk's office, testified. Ms. Metzger stated the jury panel of approximately 250 jurors had been randomly selected from voter registration lists. Ms. Metzger testified the district judge reviewed the jurors' questionnaires and directed her to excuse more than 100 specific jurors. Ms. Metzger stated she did not know the ethnicity of either the excused jurors or the jurors who had reported for service.

The court then stated it had reviewed the individual juror questionnaires and "retained the stack of those who, for some reason or other, claimed that they couldn't serve." The court explained:

> I think it goes without saying that the ones that were not summoned, I never looked at the last name, whether it was [a] Hispanic surname or whether it was not a Hispanic surname, or whether they were American Indians or not. As a matter of fact, I'm not real sure that that's part of the questionnaire --

Ms. Metzger confirmed the questionnaire forms did not direct the jurors to list their ethnicity.

The district court denied the defendants' motion to stay the proceedings and the defendants' motion to quash the jury venire. However, the court allowed the defendants to supplement the record within ten days of the completion of the trial with information concerning the racial composition of the District of New Mexico and the Roswell Division. None of the defendants chose to supplement the record with such information.

Prior to the start of trial, Ms. Gallegos' counsel, Billy Blackburn, learned Frank Gutierrez was listed as a potential witness for Mr. Aguirre. Mr. Blackburn had previously represented Mr. Gutierrez on drug charges in the District of New Mexico. Upon learning Mr. Gutierrez could be called as a witness, Mr. Blackburn

notified the court he was concerned about the attorney-client privilege and his ability to question Mr. Gutierrez. The court stated it would take up the matter if, and when, Mr. Aguirre called Mr. Gutierrez as a witness.

During the trial, when Mr. Aguirre called Mr. Gutierrez as a witness, the court asked Mr. Blackburn to determine whether Mr. Gutierrez was "planning on invoking the Fifth." Mr. Blackburn and Mr. Gutierrez then met briefly. Following their meeting, Mr. Blackburn informed the court outside the presence of the jury that Mr. Gutierrez had information he believed would be exculpatory to Ms. Gallegos. However, Mr. Blackburn stated he felt he had been placed in the position of representing competing interests. Mr. Blackburn requested the court to ask Mr. Gutierrez whether he intended to testify, and to sever the trial of Ms. Gallegos from that of her co-defendants.

The court then proceeded to question Mr. Gutierrez. The following exchange took place between the court and Mr. Gutierrez:

THE COURT: All right. And you've been subpoenaed here to testify in behalf of Mr. Gabriel Aguirre.

[MR. GUTIERREZ]: Yes, sir.

THE COURT: If you were asked questions about that -- if you were asked questions here in the courtroom in the presence of the jury, Mr. Gutierrez, would you take the Fifth Amendment?

-8-

[MR. GUTIERREZ]: Yes, sir. My lawyer's advice was to do that, and that's -- I guess that's -- I'll have to do that.

Thereafter, the prosecuting attorney requested the court to appoint independent counsel for Mr. Gutierrez to resolve any conflict issues. The court then asked Mr. Gutierrez if he would like the court to appoint another lawyer to represent him. When Mr. Gutierrez indicated he was not interested in another attorney, the court stated it would not appoint one for him. The court did not grant Ms. Gallegos' request for severance and Mr. Gutierrez did not testify at trial.

The jury ultimately returned a verdict against Ms. Gallegos on counts II and XXI -- conspiracy and money laundering. The jury was unable to reach a unanimous verdict on count XIX, investment of illegal drug proceeds, and the trial court declared a mistrial as to that count.

Following the jury's verdict, Ms. Gallegos filed a motion for acquittal and for a new trial. Ms. Gallegos argued she was entitled to a new trial because of her attorney's conflict of interest, which developed during her trial. Ms. Gallegos also contended she was entitled to a new trial because of jury misconduct. Ms. Gallegos attached an affidavit from defense investigator Kelly Owens to her motion. Mr. Owens testified that following the trial, he questioned nine of the twelve jurors who convicted Ms. Gallegos. Mr. Owens stated that one of the

-9-

jurors, Linda Howard, admitted looking up the dictionary definition of the word "distribution" on the first day of deliberations, and sharing its definition with the other jurors on the following day. In her post-trial motion, Ms. Gallegos contended this improper juror conduct prejudiced her and entitled her to a new trial.

The district court denied Ms. Gallegos' motion for acquittal and for a new trial, rejecting Ms. Gallegos' claims of conflict of interest and jury misconduct. The court concluded the word distribution was one of common usage, and there was no showing any of the jurors relied upon its dictionary definition or that it "made any difference at all in the jury deliberations." With respect to the conflict of interest issue, the court found it would not have made any difference whether Mr. Gutierrez had "Mr. Blackburn, F. Lee Bailey or Mr. Shapiro representing him." According to the court, Mr. Gutierrez did not want to get involved in the case and he would have asserted the Fifth Amendment with or without the advice of Mr. Blackburn. Thus, the court did not believe the conflict of interest was sufficient to prevent Ms. Gallegos from receiving a fair trial.

At sentencing, the trial court adopted the factual findings and guideline application in Ms. Gallegos' presentence report. The court concluded Ms.

Gallegos' guideline range should be calculated pursuant to her involvement in money laundering because her participation in the Aguirre drug conspiracy was limited to money laundering. Thus, the court found Ms. Gallegos' guideline range to be seventy to eighty-seven months, and sentenced her to a seventy-month term of imprisonment. The court declined the United States' request to enhance Ms. Gallegos' sentence under USSG. §3B1.1(a) for her role as a "leader" or "organizer."

## II.  ISSUES RAISED ON APPEAL

Ms. Gallegos' appeal raises five issues:  (1) whether the United States obtained Ms. Gallegos' criminal convictions in violation of the Fifth Amendment's protection against double jeopardy; (2) whether the superseding indictment filed after the mistrial should have been dismissed on grounds of prosecutorial vindictiveness; (3) whether the district court's pre-*voir dire* jury selection procedures violated Ms. Gallegos' constitutional rights and her rights under the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1878 (1994);[3] (4)

---

[3] Ms. Gallegos did not raise the jury selection issue in her briefs on appeal. However, on November 4, 1996, Ms. Gallegos filed a motion with this court to adopt the jury selection issue raised on appeal by her co-defendants David Morales and Eleno Aguirrre.  We hereby grant Ms. Gallegos' motion to adopt the jury selection issue.

whether the district court deprived Ms. Gallegos of her Sixth Amendment right to conflict-free representation; and (5) whether the jury's consideration of extraneous information, the dictionary definition of distribution, created a presumption of prejudice which the United States failed to rebut. The United States' cross-appeal raises two issues: (1) whether the district court erred in failing to apply the drug conspiracy guidelines, instead of those applicable to money laundering, to Ms. Gallegos, and (2) whether the district court erred in determining Ms. Gallegos was not an organizer or leader of the conspiracy.[4]

## III. ANALYSIS

### A. Ms. Gallegos' Appeal

#### 1. Double Jeopardy

Ms. Gallegos claims her criminal convictions should be dismissed because the government obtained her convictions in violation of the Fifth Amendment's prohibition against double jeopardy. According to Ms. Gallegos, the judicial forfeiture proceeding that preceded her criminal convictions served to adjudicate her personal culpability. Thus, upon entry of default judgment in the forfeiture

---

[4] Subsequent to the filing of the United States' cross appeal, Ms. Gallegos filed a motion to dismiss the United States' appeal for lack of jurisdiction. We entered an order denying Ms. Gallegos' motion to dismiss on November 19, 1996.

proceeding, Ms. Gallegos contends jeopardy attached, precluding the United States from instituting criminal proceedings against her based on the same underlying conduct.

Unfortunately for Ms. Gallegos, we decided an identical double jeopardy claim in the recent appeal of Ms. Gallegos' co-defendant, Doloras Contreras. *See United States v. Contreras*, __ F.3d ___ (10th Cir. Mar. 11, 1997). Noting the United States Supreme Court recently determined civil forfeiture proceedings do not constitute punishment under the Double Jeopardy Clause of the Fifth Amendment, we dismissed the plaintiff's double jeopardy claim in *Contreras*. *Id.* at ___ (citing *United States v. Ursery*, 116 S. Ct. 2135, 2141-42, 2149 (1996)). Under this same reasoning, Ms. Gallegos' double jeopardy claim fails.

### 2. Prosecutorial Vindictiveness

Ms. Gallegos contends the district court should have dismissed the superseding indictment because of prosecutorial vindictiveness. Following the mistrial, the United States filed a superseding indictment expanding the conspiracy charges against Ms. Gallegos to include cocaine, and adding another count against Ms. Gallegos relating to the investment of funds in Amador Investors. Ms. Gallegos asserts the United States was aware of the information

-13-

giving rise to the increased charges prior to her first trial. Given its prior

knowledge, along with the negative publicity the United States suffered following

the mistrial, Ms. Gallegos contends "there is a reasonable likelihood that the

increased charges were motivated by vindictiveness."

Once again, we decided a virtually identical vindictive prosecution claim in

*Contreras*. __ F.3d at ___. Looking to the totality of the circumstances in

*Contreras*, we determined there was no reasonable likelihood the increased

charges against Ms. Contreras stemmed from prosecutorial vindictiveness. *Id.* at

___. Based on our reasoning in *Contreras,* we likewise conclude the enhanced

charges against Ms. Gallegos were not motivated by prosecutorial vindictiveness.

### 3. Jury Selection

Ms. Gallegos argues the district court's excusal of over half of the original

jury panel, off the record and outside the presence of the defendants and counsel,

violated the Jury Selection and Service Act, as well as Ms. Gallegos' Fifth and

Sixth Amendment rights. 28 U.S.C. § 1867(d) requires all motions challenging

compliance with the Jury Selection and Service Act to be accompanied by a

"sworn statement of facts which, if true, would constitute a substantial failure to

comply with the [Jury Selection and Service Act]." 28 U.S.C. 1867(d). In

*Contreras*, we determined Ms. Contreras' claim under the Jury Selection and Service Act was barred by the defendants' failure to accompany their motions challenging the district court's jury selection procedures with an adequate sworn statement as required by 28 U.S.C. § 1867(d). *Contreras*, __ F.3d at ___. Here, as in *Contreras*, Ms. Gallegos failed to file a sworn affidavit in support of her motions challenging the district court's jury selection procedures. Consequently, Ms. Gallegos' Jury Selection and Service Act claim is barred.

Also in *Contreras*, we denied Ms. Contreras' Fifth and Sixth Amendment challenges to the jury selection procedures. *See id.* at ___. Specifically, we determined Ms. Contreras could not establish a prima facie case of a fair cross section violation or an equal protection violation, and we concluded Ms. Contreras' Sixth Amendment impartial jury claim was without merit. *Id.* For the reasons stated in *Contreras*, we likewise find no merit in Ms. Gallegos' constitutional challenges to the district court's jury selection procedures.[5]

---

[5] In *Contreras*, we also determined the district court did not violate Fed. R. Crim. P. 43 or 28 U.S.C. § 753(b) (1944)by failing to dismiss the 132 jurors in open court and in the presence of the defendants. *See Contreras*. __ F.3d at ___. To the extent Ms. Gallegos asserts claims under Rule 43 or 28 U.S.C. § 753(b), these claims are rejected pursuant to our reasoning in *Contreras*.

### 4. Right to Conflict-Free Counsel

Next, Ms. Gallegos contends the district court deprived her of her Sixth Amendment right to conflict-free counsel. Ms. Gallegos argues her counsel, Mr. Blackburn, suffered an actual conflict of interest, because his "client witness" (Mr. Gutierrez) asserted his Fifth Amendment privilege in order to avoid exposure to new charges, at the expense of failing to provide favorable testimony for Ms. Gallegos. According to Ms. Gallegos, the district court's failure to either sever her from the remaining defendants or inquire as to whether she would waive the conflict requires this court to reverse her convictions.

In reviewing an ineffective assistance of counsel claim based upon a conflict of interest, we review the district court's determination of whether an actual conflict existed de novo, and we review the district court's factual findings under a clearly erroneous standard. *United States v. Martin*, 965 F.2d 839, 841 (10th Cir. 1992) (citing *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 480 (10th Cir. 1990)). "A ruling on a motion for mistrial is within the sound discretion of the district court, and will not be disturbed absent a clear abuse of that discretion." *United States v. Wacker*, 72 F.3d 1453, 1466 (10th Cir. 1995), *cert. denied*, 117 S. Ct. 136 (1996). Similarly, we review a district court's decision to grant or deny a motion for a new trial under an abuse of discretion

-16-

standard. Ms. Gallegos asserted this claim during trial and in a motion for a new trial. *United States v. Muldrow*, 19 F.3d 1332, 1339 (10th Cir.), *cert. denied*, 115 S. Ct. 175 (1994).

Generally, ineffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (*en banc*). "Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed." *Id.* This rule "encourages development of a record on the tactical reasons for trial counsel's decisions, the extent of trial counsel's alleged deficiencies, and the asserted prejudicial impact on the outcome of the trial." *Beaulieu v. United States*, 930 F.2d 805, 807 (10th Cir. 1991), *overruled in part by Galloway*, 56 F.3d at 1241.

Nevertheless, we have considered ineffective assistance of counsel claims on direct appeal where such claims were adequately developed by the district court prior to appeal. *Galloway*, 56 F.3d at 1240-41. The instant appeal contains just such a claim. As stated, Ms. Gallegos asserted her conflict of interest argument (which is the basis for her ineffective assistance of counsel claim) at trial and in a post-trial motion. In its post-trial order, the district court weighed

the merits of her argument and denied her claim. Ms. Gallegos' ineffective assistance of counsel claim is well-documented in the record and, therefore, we will review her claim on direct appeal.

The Sixth Amendment to the United States Constitution entitles a defendant in a criminal case to the effective assistance of counsel. *Powell v. Alabama*, 287 U.S. 45 (1932). "The purpose [of this amendment] is to ensure that criminal defendants receive a fair trial." *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (citation omitted). A defendant's right to the effective assistance of counsel includes a right to "'representation that is free from conflicts of interest.'" *United States v. Cook*, 45 F.3d 388, 393 (10th Cir. 1995) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). This right to conflict-free representation "'extends to any situation in which a defendant's counsel owes conflicting duties to that defendant and some other third person.'" *Id.* (quoting *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988)).

In *Holloway v. Arkansas*, 435 U.S. 475 (1978), the Supreme Court set forth principles for evaluating whether a defendant's right to conflict-free representation has been violated in situations where the alleged conflict of interest has been brought to the trial court's attention in a timely fashion. The

district court in *Holloway* jointly tried three defendants who were represented by one public defender. *Id.* at 477. Prior to trial, the defendants' attorney moved the court to appoint separate counsel for each defendant because of a potential conflict of interest. *Id.* After conducting a hearing on the motion, the court declined to appoint separate counsel. *Id.* On the second day of trial, the defendants' counsel informed the court all three defendants had decided to testify and the "conflict will probably be now coming up." *Id.* at 478. In response, the court stated "[t]hat's all right; let them testify. There is no conflict of interest." *Id.* at 479. Following the defendants' testimony, the jury returned guilty verdicts on all counts. *Id.* at 481.

On appeal, the Supreme Court reversed the convictions. *Id.* at 484-91. The Court determined that although defense counsel brought the potential conflict of interest to the court's attention in a timely fashion, the trial court erred in failing to either "appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." *Id.* at 484. According to the Court, the trial court's failure to take such precautionary measures "deprived [the defendants] of the guarantee of 'assistance of counsel,'" and mandated reversal. *Id.* at 484, 488-90. The Court declared the "assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can

never be treated as harmless error.'" *Id.* at 489 (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)). Thus, where timely objection is made to joint representation of conflicting interests, and where the trial court fails to adequately address the conflicting interests, reversal is automatic. *Holloway*, 435 U.S. at 488-90.

Of course, a court may avoid a conflict of interest problem by securing a waiver of a defendant's right to conflict-free representation. It is well settled that a defendant may waive his right to conflict-free counsel. *See Holloway*, 435 U.S. at 483 n.5 ("a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests") (citing *Glasser v. United States*, 315 U.S. 60, 70 (1942)); *see also Edens v. Hannigan*, 87 F.3d 1109, 1118 (10th Cir. 1996). However, the waiver of a constitutional right must not only be voluntary, but must be a knowing, intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). In determining whether a defendant has waived his right to conflict-free representation, a court must "indulge every reasonable presumption against the waiver." *Glasser*, 315 U.S. at 70.

Recently, the Tenth Circuit was presented with a conflict of interest claim

strikingly similar to Ms. Gallegos' claim. In *Cook*, defendants Lewis Cook and Yvonne Cross retained counsel Jeffrey Fischer to jointly represent them following their arrest on drug charges. 45 F.3d at 391. Ms. Cross entered into a plea agreement which required her to testify against her co-defendant. *Id.* Thereafter, the United States filed a motion to recuse Mr. Fischer from representing Ms. Cross due to the conflict of interest. *Id.* The district court granted the motion and appointed separate counsel for Ms. Cross. *Id.*

When the United States called Ms. Cross to testify at Mr. Cook's trial, Ms. Cross refused to testify against Mr. Cook. *Id.* The district court then ordered Mr. Fischer to "visit with Ms. Cross" and advise her of the consequences of her failure to testify. *Id.* Although Mr. Fischer reminded the court of his conflict of interest, the court reiterated its order. *Id.* Mr. Fischer, along with the prosecuting attorney and Ms. Cross' court-appointed attorney, then met with Ms. Cross.[6] *Id.* Following the meeting, Ms. Cross testified against Mr. Cook, and Mr. Cook was ultimately convicted. *Id.*

---

[6] At the meeting, Mr. Fischer did not actually communicate with Ms. Cross. *Id.* He was merely an observer to the conversation between Ms. Cross, the prosecuting attorney, and Ms. Cross' court-appointed attorney. *Id.*

On appeal, Mr. Cook argued he was denied effective assistance of counsel free from conflicts of interest when the trial court ordered Mr. Fischer to advise Ms. Cross to comply with her plea agreement. *Id.* at 393. Noting Mr. Cook timely objected to the conflict of interest at trial, we determined the principles set forth by the Supreme Court in *Holloway* were controlling. *Id.* We reasoned:

> In the face of this timely objection, and after previously recusing Fischer from representing Cross because of the conflict of interest, the district court "turn[ed] a blind eye to an obvious possible conflict," and again insisted that Fischer meet with Cross "for the limited purpose of ... advising her of what [could] happen" if she failed to testify in accordance with her plea agreement. Under these circumstances, we conclude the district court failed to comply with the dictates of *Holloway* by ... "'*insisting ... that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court.*'" As a result, Defendant was deprived of his Sixth Amendment right to conflict-free assistance of counsel.

*Id.* at 394 (citations omitted) (emphasis added).

Here, as in *Holloway* and *Cook*, defense counsel brought the potential conflict of interest to the trial court's attention in a timely fashion. On the first day of trial, when Mr. Blackburn learned Mr. Gutierrez was listed as a potential witness, Mr. Blackburn informed the district court he was concerned about the attorney-client privilege and his ability to question Mr. Gutierrez without a waiver of that privilege. Prior to the calling of Mr. Gutierrez as a witness during the trial, Mr. Blackburn reiterated his concerns to the court with more specificity. As

-22-

stated by Mr. Blackburn:

> my loyalties to [Mr. Gutierrez] has to be to say you need to take the Fifth Amendment. My loyalties to my client, Sonia Gallegos, is that he should testify. I see no way to rectify that decision ....

Due to this conflict, Mr. Blackburn requested the court to sever the trial of Ms. Gallegos from that of her co-defendants. We believe Mr. Blackburn's advisements to the district court on these two occasions sufficiently apprised the court of the conflict of interest.

Because Mr. Blackburn brought the conflict of interest to the trial court's attention in a timely fashion, *Holloway* controls the outcome of Ms. Gallegos' conflict of interest claim. In order for the district court to have complied with the mandates of *Holloway*, the court must have, upon learning of the potential conflict, either: (1) appointed separate counsel to represent Mr. Gutierrez; (2) taken "adequate steps to ascertain whether the risk was too remote to warrant separate counsel;" or (3) determined if both Ms. Gallegos and Mr. Gutierrez were willing to waive their right to conflict-free representation. *See Holloway*, 435 U.S. at 483-84 & n.5. The district court's failure to take one or more of these measures requires reversal. We now turn to the district court's actions.

When Mr. Blackburn informed the court of his concerns on the first day of

trial, the court took no action. Rather, it informed the parties it would deal with the issue when and if Mr. Gutierrez was called as a witness. We do not believe the trial court erred in electing not to resolve the issue on the first day of trial. At that stage, there was a distinct possibility the potential conflict of interest would never surface. Mr. Gutierrez was merely listed as a witness on one of the ten defendants' witness lists. Rarely do all such witnesses testify at trial. Thus, the trial court's decision to defer consideration of the issue until it arose was not, standing alone, erroneous.

Nevertheless, the trial court's actions immediately preceding the calling of Mr. Gutierrez as a witness require closer scrutiny. When the trial court learned Mr. Aguirre would be calling Mr. Gutierrez as his next witness, the court asked Mr. Blackburn if he would like to confer with his "client" (Mr. Gutierrez). The trial court then asked Mr. Blackburn to determine whether Mr. Gutierrez was "planning on invoking the Fifth." After Mr. Blackburn and Mr. Gutierrez met briefly, Mr. Blackburn informed the court of his conflict of interest concerns and requested a severance for Ms. Gallegos. The court then asked Mr. Gutierrez if he intended to assert his Fifth Amendment rights. When Mr. Gutierrez replied he would be invoking the Fifth Amendment based on the advice of his lawyer (Mr. Blackburn), the prosecuting attorney requested the court to appoint independent

-24-

counsel for Mr. Gutierrez to resolve any conflict issues. The court and Mr. Gutierrez then engaged in the following exchange:

> THE COURT: ... [Y]ou don't mind getting another lawyer, do you, Mr. Gutierrez?

> [MR. GUTIERREZ]: I'd rather -- I've always had -- dealt with Billy. I'd rather have him.

> THE COURT: Okay. Well, I won't appoint you another one. If you don't want anybody, that's it.

The court did not grant Ms. Gallegos' request for severance and Mr. Gutierrez did not testify at trial.[7]

Thus, the trial court did not appoint separate counsel for Mr. Gutierrez or take any steps to ascertain whether the risk of conflict was too remote to warrant separate counsel. Moreover, the trial court neglected to determine whether Mr. Gutierrez and Ms. Gallegos were willing to waive their Sixth Amendment right to conflict-free representation. The record reveals the court was oblivious to the duty Mr. Blackburn owed to Ms. Gallegos. The trial court focused exclusively on the obligation Mr. Blackburn owed to Mr. Gutierrez. As the district court in *Cook*

---

[7] Following the district court's decision to not appoint another lawyer for Mr. Gutierrez, a sealed *in camera* hearing was held at the request of Mr. Blackburn. During the hearing, Mr. Blackburn elaborated on the nature of the conflict of interest. The district court made no rulings or substantive comments at the *in camera* hearing.

requested defense counsel to confer with the witness-client, the district court here encouraged Mr. Blackburn to meet with Mr. Gutierrez. The court even went so far as to request Mr. Blackburn to inquire whether Mr. Gutierrez would be invoking the Fifth Amendment.

If the trial court had, in fact, taken "adequate steps to ascertain whether the risk was too remote to warrant separate counsel," *Holloway*, 435 U.S. at 484, the court would have determined there was indeed a material conflict of interest present. As Mr. Blackburn explained to the court, he was in a very precarious situation. Because Mr. Gutierrez possessed information that was exculpatory to Ms. Gallegos, Mr. Blackburn's duty to Ms. Gallegos was to encourage Mr. Gutierrez to testify and to attempt to elicit this exculpatory information from him. On the other hand, Mr. Blackburn's obligation to Mr. Gutierrez was to discourage him from testifying. If Mr. Gutierrez had testified, he would have subjected himself to the risk of additional criminal charges. Thus, there was a real conflict of interest present, and the trial court erred in failing to either obtain a waiver from Ms. Gallegos or take adequate steps to protect Ms. Gallegos' right to conflict-free representation.

The United States cites *United States v. McCullah*, 76 F.3d 1087 (10th

Cir.), *petition for cert. filed*, (U.S. Nov. 22, 1996) (No. 96-6841), for the proposition that because Mr. Gutierrez never testified, a conflict never materialized. In *McCullah*, the defendant argued his attorney, an assistant public defender, represented him under a conflict of interest because a prospective United States witness was being represented by another assistant in the same public defenders' office. *Id.* at 1098. However, we determined a conflict of interest never materialized because the trial court did not permit the United States' witness to testify. *Id.* at 1099. The trial court in *McCullah* "assessed the risk of conflict and properly determined that disallowing [the potential conflicting witness'] testimony adequately eliminated any risk." *Id.* By doing so, the trial court complied with the mandates of *Holloway*. *Id.* at 1098-99.

*McCullah* is inapposite to the instant case. Here, unlike *McCullah*, the trial court did not assess the risk of conflict and determine Mr. Gutierrez could not testify on behalf of Mr. Aguirre. Instead, the record indicates the court was perfectly willing to allow Mr. Gutierrez to testify. Although Mr. Gutierrez asserted his Fifth Amendment privilege, this did not obviate Mr. Blackburn's conflict of interest. Because Mr. Gutierrez could have given exculpatory testimony on Ms. Gallegos' behalf, his refusal to testify, based on the advice of Mr. Blackburn, actualized the conflict of interest. As in *Cook*, Mr. Blackburn

"was placed in a position of representing interests of a ... witness directly adverse to those of his client." 45 F.3d at 394. If the trial court had recognized the conflict of interest and the duty Mr. Blackburn owed to Ms. Gallegos rather than focusing solely on Mr. Blackburn's duty to Mr. Gutierrez, the trial court would either have sought a waiver from Ms. Gallegos of her right to conflict-free representation or appointed independent counsel to represent Mr. Gutierrez. Unfortunately, the trial court did neither and, therefore, under *Holloway*, it committed reversible error.[8]

## 5. Jury Misconduct

Finally, Ms. Gallegos contends the jury's improper reliance on the dictionary definition of the term "distribution" created a presumption of prejudice that was not rebutted by the United States. Having determined Ms. Gallegos is entitled to a new trial based on the violation of her Sixth Amendment right to conflict-free representation, we need not consider the issue of jury misconduct.

---

[8] Nor can the trial court's post-trial observations on the conflict issue cure the trial court's failure to follow the mandates of *Holloway*. The trial court denied Ms. Gallegos' motion for a new trial based upon ineffective assistance of counsel because it determined Mr. Gutierrez would have asserted the Fifth Amendment with or without the advice of Mr. Blackburn. This may or may not be true. The fact remains the trial court failed to secure a waiver or otherwise adequately address the conflict situation when it arose, as required by *Holloway*.

**B. United States' Appeal**

The United States contends the district court erred in (1) failing to apply the drug conspiracy guidelines to Ms. Gallegos and (2) determining Ms. Gallegos was not an organizer or leader of the conspiracy. Because Ms. Gallegos is entitled to a new trial, we have no reason to consider these issues.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the convictions of Ms. Gallegos and **REMAND** this action to the district court for further proceedings consistent with this opinion.