**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 11 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

QUANTIS HAWKINS,

      Defendant-Appellant.

Nos. 96-2176 and 97-2168[*]
(D.C. No. CR-96-206-BB)
(D. New Mexico)

**ORDER AND JUDGMENT**[**]

Before **BRORBY**, **HOLLOWAY** and **EBEL**, Circuit Judges,

Defendant Quantis Hawkins was convicted by a jury on one count of bank robbery.

Defendant filed a motion for a new trial which was denied by the district court. Defendant

---

[*]On August 14, 1996, defendant, acting *pro se*, filed a letter with the district court which was construed as a Notice of Appeal. This notice was premature as judgment was not entered against the defendant until May 5, 1997. However, we assigned case number 96-2176 to defendant's notice of appeal. On May 14, 1997, after judgment had been entered, defendant's appointed counsel filed a timely notice of appeal and our court assigned the case a second case number, 97-2168. On our own motion, on June 3, 1997, we ordered these two appeals consolidated for all purposes. This order and judgment shall be the disposition of both appeals.

[**]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under terms and conditions of 10th Cir. R. 36.3

was then sentenced to a term of imprisonment of 51 months. Defendant appeals his conviction and the denial of his motion for a new trial. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

# I

On March 25, 1996, a lone robber, described as an African-American male in his early twenties, wearing wrap-around sunglasses and a baseball cap, and carrying a gym bag, robbed the Norwest Bank San Mateo Branch on Zuni Street in Albuquerque, New Mexico. II R. at 35. The robbery occurred at about 10:10 a.m. Id. at 110.[1] The robbery lasted less than five minutes. Both the Federal Bureau of Investigation and the City of Albuquerque Police Department responded to the bank robbery.

Lori Figura was designated as the FBI agent. Ms. Figura received information that made defendant a suspect. She obtained a photograph of defendant, placed it in a photograph array, and showed the array to one customer and two bank tellers who had been inside the bank at the time of the robbery. Id. at 184-85. Both bank tellers identified defendant as the robber. Id. at 185. The customer did not identify any of the individuals depicted in the photo array as the robber. Id. at 45. Defendant was arrested the next day.

The trial commenced on July 30, 1996. The prosecution called eight witnesses: seven who were present at the bank at the time of the robbery and FBI Agent Figura. All seven eyewitnesses were within about three to fifteen feet of the robber during the robbery. Nearly

---

[1]The bank is insured by the FDIC. Id. at 132.

all of the witnesses estimated the bank robber's height to be approximately between five feet seven inches and six feet. Id. at 40; 60; 76; 114. Defendant is six feet four inches tall. No witness described facial hair on the robber and several affirmatively remembered that the robber was clean shaven. Id. at 61; 87; 101; 114. At the time of the robbery, defendant had a mustache and sideburns.

Despite the inconsistencies in their description of the robber, three of the seven witnesses identified defendant as the robber. Id. at 44 (Robert Chavez); id. at 98-99 (Raphael Martin); id. at 141-42 (Holly Revelles). Only two of the three witnesses identifying defendant at trial had been presented with a pretrial identification photograph array. One teller, Holly Roybal, testified that though she could not identify defendant as the bank robber, she was "almost positive" that the tattoo on defendant's neck was the same as the tattoo on the robber. Id. at 168-69. The other three witnesses could not identify defendant as the robber. Id. at 63 (Levi Scott); id. at 77 (Donna Burkholder); id. at 116 (Susan Moore). However, when questioned by the prosecutor, each testified that defendant had physical characteristics similar to those of the robber. Id. at 64 (Levi Scott); id. at 78 (Donna Burkholder); id. at 116 (Susan Moore). Of these three, Susan Moore had previously identified defendant as the robber in a photo spread conducted one week before trial. Id. at 117-18. Defendant's counsel cross-examined each witness on the issue of defendant's identity. Id. at 51, 66, 81, 101, 121, 156, 176-77.

The defendant did not testify at trial. He did present an alibi defense by the testimony of two witnesses, Hawkins's mother and stepfather. Both testified that Hawkins was at home at the time of the robbery. His mother testified that he talked with her at approximately 10:00 a.m. that day and that he was still at home, just getting out of bed, when his parents arrived about 10:20 a.m. II R. at 243-45, 259-260.

After the verdict of guilty and entry of judgment of conviction and sentence, this appeal followed.

## II

Defendant raises two issues on appeal. First, he directly appeals the district court's denial of his motion for a new trial. The basis for his request for a new trial is a claim of ineffective counsel. Second, defendant contends the district court erred in permitting the in-court identifications in violation of his due process rights.

## A

### Defendant's Claim of Ineffective Counsel

Defendant appeals the district court's denial of his motion for a new trial based on a claim of ineffective counsel. However, such claims should be presented in collateral proceedings, not on direct appeal. United States v. Galloway, 56 F.3d 1239, 1240 (10th Cir. 1995) (*en banc*); United States v. Jackson, 88 F.3d 845, 846 (10th Cir. 1996).[2]

---

[2]The preferred method of bringing a claim of ineffective counsel is by post-conviction proceedings pursuant to 28 U.S.C. § 2255. A claim for relief under § 2255 may afford an opportunity for the district court to hold an evidentiary hearing. See Galloway, 56 F.3d at

Ineffectiveness of counsel claims that are asserted on direct appeal are presumptively dismissible, and "virtually all will be dismissed." Galloway, 56 F.3d at 1240.

In Galloway, we reasoned that the resolution of a claim of ineffective counsel requires a developed factual record. Id. The district court is the forum appropriate for such development. Id. The facts here are not so extraordinary that we find need to depart from our adherence to the Galloway rule. See Jackson, 88 F.3d at 847. The record here has not been adequately developed by the district court prior to appeal for us to determine the merits of the claim of ineffective counsel. Compare United States v. Gallegos, 108 F.3d 1272, 1280 (10th Cir. 1997)(defendant asserted conflict of interest argument at trial and in post-trial motion, which the district court, upon weighing the merits of the claim, denied in its post-trial order).

We dismiss defendant's claim of ineffectiveness of counsel without prejudice.

**B**

**Defendant's Claim That In-Court Identifications Were the Product of Questioning So Impermissibly Suggestive As to Violate Due Process.**

Defendant does not raise sufficiency of the evidence as an issue in this case. Instead, defendant contends that all of the in-court identifications were the product of questioning so impermissibly suggestive as to violate due process. It is a recognized ground of attack on a conviction that confrontation and interrogation were so unnecessarily suggestive and

---

1240 n.1.

conductive to irreparable mistaken identification that the defendant was denied due process of law. Stovall v. Denno, 388 U.S. 293, 301-02 (1967). Such a claimed violation of due process depends on the totality of the circumstances surrounding it. Id. at 302. Because the defendant did not object to the in-court identification at trial here, we review for plain error. See United States v. Lonedog, 929 F.2d 568, 570 (10th Cir. 1991). For plain error to be present, the error must be obvious or otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings. United States v. Simmonds, 931 F.2d 685, 687 (10th Cir. 1991).

Three of the witnesses, Moore, Revelles and Roybal, were shown a pretrial photo array by FBI Agent Figura. Defendant does not challenge any pretrial identification procedures as violative of his due process rights. The government contends that because defendant failed to challenge the validity of the pretrial identifications, the subsequent in-court identification cannot violate the defendant's due process rights. Romero v. Tansy, 46 F.3d 1024, 1032 (10th Cir. 1995). "Any suggestiveness in the courtroom identification procedure is a matter for the jury to consider in weighing the persuasiveness of the witness' testimony." Id.

We believe the proper analysis here is to examine the record to determine "whether the in-court identification procedure was so suggestive that it denied defendant due process of law." United States v. Kimball, 73 F.3d 269, 273 (10th Cir. 1995); United States v. Robertson, 19 F.3d 1318, 1323 (10th Cir. 1994); United States v. Aigbevbolle, 772 F.2d

652, 653 (10th Cir. 1985). A defendant is denied due process of law when an impermissibly suggestive identification leads to a substantial likelihood of irreparable misidentification. Manson v. Brathwaite, 432 U.S. 98, 116 (1977); Aigbevbolle, 772 F.2d at 653. Our decision in Romero should not be taken to mean that an in-court identification is always constitutionally valid if a defendant fails to challenge a pretrial identification. Instead, our analysis as to impermissible suggestiveness of an in-court identification is identical, whether it concerns a witness who had a pretrial opportunity to identify defendant, or a witness who identifies the defendant for the first time at trial.

Turning to the in-court identifications here, for purposes of defendant's due process claim we hold that the district court did not commit plain error by allowing the in-court identifications because we do not view the prosecutor's conduct as impermissibly suggestive.[3] The prosecutor asked each witness if he or she recognized the bank robber in the courtroom. Some of the witnesses were able to identify defendant and others could not. The prosecutor then inquired if defendant had characteristics similar to the characteristics of the bank robber. While the procedure was not a reassuring model to support a conviction in a criminal case, the prosecutor's questioning was not so impermissibly suggestive as to lead to a substantial likelihood of misidentification. Manson, 432 U.S. at 116. The prosecutor's inability to exact precise identifications gave defendant the opportunity to attack the

---

[3]We summarize critical portions of the identification testimony in the appendix following this order and judgment.

reliability of each witness' identification testimony on cross-examination. See Kimball, 73 F.3d at 273; Romero, 46 F.3d at 1032 ("Any suggestiveness surrounding the courtroom identification was a matter to be considered by the jury in weighing the reliability of [the witness'] identification testimony."). Defendant's counsel cross-examined each witness on the identification.

Defendant's principal argument is that the prosecutor goaded the witnesses into testifying that defendant resembled the bank robber even though all of the witnesses had some difficulty identifying defendant as the robber. An identification is not unreliable because it is phrased in uncertain terms. United States v. Peoples, 748 F.2d 934, 936 (4th Cir. 1984), cert. denied, 471 U.S. 1067 (1985). We have previously held that there is no deprivation of due process rights by requiring a defendant to wear a cap and dark glasses worn by the bank robber for purposes of identification. Robertson, 19 F.3d at 1322-23; see also Burnett v. Collins, 982 F.2d 922, 927 (5th Cir. 1993)(compelling defendant to provide voice exemplar does not violate Fifth Amendment privilege against self-incrimination); United States v. Walitwarangkul, 808 F.2d 1352, 1353 (9th Cir. 1987)(district court did not commit error in granting prosecutor's request to have prisoner try on a jacket and hold up a pair of pants to facilitate identification). Here defendant was required to rise and state his name, address and age for a witness to make a voice comparison, II R. at 142-144; defense counsel did not object.

That defendant was only one of two African-Americans in the courtroom for most of the trial is not reversible error. See United States v. Davis, 103 F.3d 660, 670 (8th Cir. 1997), cert. denied, 117 S. Ct. 2424 (1997). If defendant had concern with the racial composition of the courtroom, defendant could have requested the district court to reduce the inherent suggestiveness of the in-court identifications by facilitating other seating arrangements, ordering in-court lineups, and/or altering the racial composition of the courtroom. Robertson, 19 F.3d at 1323; United States v. Matthews, 20 F.3d 538, 547 (2d Cir. 1994).[4]

We are persuaded that, considering the totality of the circumstances, the identifications were "reliable even though the confrontation procedure was suggestive." Neil, 409 U.S. at 199; see also Archuleta v. Kerby, 864 F.2d 709, 711 (10th Cir. 1989). Each witness on identification of defendant had an opportunity to view the defendant at the time of the crime. See id. at 712. Although there was a time gap from the robbery on March 25, 1996, until trial on July 30, 1996, and the witnesses all had some inconsistencies as to defendant's identity as the robber, these factors do not require a reversal here. See id. (underestimation of height and errors in not reporting tattoos to police not sufficient to make in-court identifications unreliable).

---

[4]We note that defense counsel may tactically decide not to request such procedures. See Matthews, 20 F.3d at 547 ("counsel may well deem it preferable not to chance bolstering the in-court identification of his client in any way, permitting counsel to argue to the jury that the in-court identification was inherently weak.").

The claim of ineffectiveness of counsel is **DISMISSED WITHOUT PREJUDICE;**

otherwise, the judgment of the district court is **AFFIRMED.**

Entered for the Court

William J. Holloway, Jr.
Circuit Judge

-10-

# APPENDIX

We summarize below testimony of several government witnesses:

## Holly Revelles

Holly Revelles testified she was an employee of Norwest Bank for about two years as a teller. II R. at 124. She first started October 19, 1994, and started working at the San Mateo Branch on Zuni Street in November 1994. She was working there on March 25, 1996.

She was helping a customer at about 10:10 that morning who was at her window. She was interrupted by a gentleman who said, "Excuse me." Id. at 127. She told him he would need to wait because she was with a customer. This man seemed to hesitate and then came forward and said, "Excuse me," again. Id. at 128. Then he told her: "No, I don't think you understand. This is a bank robbery."

Ms. Revelles identified in a photograph, Government Exhibit 1, the man who said it was a robbery. Id. at 129. He was a gentleman with a baseball cap and a plaid shirt behind her customer. The surveillance photograph said 9:20 a.m. Id. at 129. The fourth photograph in Government Exhibit 1 showed the man handing her the backpack, and this was when he instructed Revelles to put all of the money in the bag. The photo showed Ms. Revelles as the teller. Id. at 130. She did not see a gun and the robber never said anything about a gun. Id. at 131. She put almost $3,000 in the bag. Ms. Revelles said the bank is insured by the FDIC. Id. at 132.

Ms. Revelles wears glasses and had them on at the time. Id. at 134. She was approximately three feet from the robber and said she did get a good look at him. Id. at 135. He was African-American, in his early twenties, and about 5'7" or 5'8" tall. Id. at 136. She said that if she had told an FBI agent the robber was 6'1" that would be the height. Id. at 137. He was average in build. She did not see any facial hair.

Ms. Revelles testified she thought she would recognize the person who robbed her about five months ago. Id. at 139. She was asked then to look around the room and she identified a man at the counsel table. The prosecutor asked permission to have defendant Hawkins rise, which was permitted. Ms. Revelles looked at him and then said: "Yes, I would say that is him." This was because of his features and skin tone, and his whole appearance. Id. at 140. She did not see any distinctive tattoos on the robber. She said that the man who stood was "in the same height category" as the robber. Id. at 141. Defendant Hawkins had the same build as the robber and he had the same skin tone as the person who

robbed her.  Id. at 141-42.  The prosecutor asked: "Are you sure that Mr. Hawkins is the robber, Ms. Revelles?"  She replied, "Yes, I am."  Id. at 142.  She said this was because of his whole physical appearance and that "he looks like the person that robbed me."  Id. at 142.

The prosecutor asked whether there was anything distinctive about the robber's voice, and Ms. Revelles said his tone was "very nice, very cordial . . . the man who came in just had a pleasant voice."  Id. at 143.  The prosecutor asked if the court would instruct defendant Hawkins to state his name, address and age, and with no objection by defense counsel, Hawkins did so.  The prosecutor then asked about the voice, and Ms. Revelles said, "It strikes a memory in my mind of the voice that I heard when I was robbed.  It is a familiar voice."  Id. at 144.  She concluded: "I am confident that this voice is similar to the man that robbed me on that day . . . I would say it was the same voice."  Id. at 145.

Looking at a photograph of defendant, Revelles said she recognized him.  She saw there was a mustache on the picture, but said she did not recall seeing one the day of the robbery.  Id. at 146.

On cross-examination, Revelles said that the subject who committed the robbery could have had a mustache.  Id. at 148.  Revelles testified that her recollection at trial was the robber was 5'6" to 5'7", but he could have been 6'1".  Her "recollection had diminished over the period of time."  Id. at 151.  Revelles said that looking at Hawkins, he was the same height as the robber.  Id. at 152.  Revelles admitted that in his photo in Government Exhibit 1, the subject was clean-shaven and with no mustache.  Id. at 156.

### Susan Denise Moore

Ms. Moore testified that she had been a bank teller at the Norwest Bank Branch on San Mateo and Zuni Streets for some six months.  She was working there on March 25, 1996.  Id. at 109-110.  At about 10:10 a.m. she was serving as a teller along with Holly Revelles and Holly Roybal.  She was shown Government Exhibit 1, a composite and the fourth photograph in the series showed the three tellers and a person who robbed the bank.  Id. at 111.  Moore was about two feet away from the point where the robbery took place.  Moore heard the robber say, "Give me the money."  But she did not see a gun or any weapon.  Id. at 112.  Moore saw Revelles put the money in the bag, and then the robber ran out the door.  Id. at 112.

Moore got a "fairly good look at [the robber]."  Id. at 113.  The robber was average in height, not taller than 6', and about 135 lbs. in weight.  He was clean-shaven.  Id. at 114.

Ms. Moore was asked to look around the courtroom and whether anyone looked like the person who robbed the bank. She replied: "I can't say for sure." Id. at 116. Defendant was asked to rise, to which there was no objection. Moore was asked about similarities or dissimilarities to the bank robber. She said his skin tone was the same: "He was good looking. He wasn't scruffy, about the same height, same build. I couldn't say for sure that that would be him." Id. at 116. She did not see any distinctive tattoos on the robber. Id. at 117.

She testified that she had picked out photo number five on Government Exhibit 4 "because of the skin tone and the good looking characteristics." Id. at 118. She was asked about facial hair and she said she was sure there was none "on the sides," but she did not remember about a mustache. Id. at 119. On cross-examination she testified she had been shown a photo lineup with six pictures on it. There was no suggestion made that the person was in the photo lineup. Id. at 122. She did pick defendant Hawkins out on the photo lineup because of his complexion and color. Id. at 122. She said she was asked whether from looking at defendant Hawkins she could say he was the bank robber, and she replied: "No, not for sure." Id. at 123.

**Holly Roybal**

Holly Roybal had been employed at the Norwest Bank for ten months in the branch at San Mateo on Zuni Street. A man came up to the teller next to her, Holly Revelles, and, after a couple of minutes, said: "This is a robbery." Id. at 162. In Government Exhibit No. 1, Roybal recognized herself and saw the person who ultimately robbed the bank. Id. at 163. The man said: "This is a robbery." And then he leaned on the counter. Id. at 164. She got a good look at his face. He had a black hat and black sunglasses on. Id. at 165.

The robber was an African-American, probably 5'10" or 6' in height. Id. at 166. Ms. Roybal saw a tattoo on the right side of his neck. Id. at 167. She said to the police that the tattoo looked "like a grapevine or a picket fence." Id. at 167. Looking at a photograph, Government Exhibit No. 3, Roybal testified that she was almost positive it was the same tattoo she saw on the bank robber. Id. at 169.

She was asked to look around the courtroom, and replied that she could not say from the glasses and hat she remembered that the robber appeared to be there. She said, "I don't think it would be fair to point him out." Id. at 170. She was asked about the defendant's relative build, which compared to the robber. She said he did fit the size, height and weight of the robber but that she still could not say Hawkins was the robber: "I just don't think that is fair, I am sorry." Id. at 173. On cross-examination, Ms. Roybal said she did not remember the robber having any facial hair at all. Id. at 176. She remembered the tattoo

looking like "a grapevine." Id. at 176. On redirect, she was shown a photo in Government Exhibit 3, and had no doubt it was the same tattoo she saw on the bank robber. Id. at 178.

## Lori Figura

The government called Lori Figura as a witness for the prosecution. She testified she is an FBI agent. II R. at 179. Ms. Figura is assigned to the Violent Crimes Reactive Squad, which encompasses bank robberies. Id. at 180. She responded to the bank robbery at the Norwest Bank on March 25th of 1996. She said that she arrived at the bank at approximately 11:00 or shortly after 11:00, and was accompanied by other FBI agents; she thinks that there were three. Id. at 181. Then another joined, so that there were five agents in all.

When Ms. Figura and her fellow FBI agents got there at 11:00, Albuquerque Police Department officers were already there, three of them. II R. at 181. Ms. Figura was the case agent on this bank robbery. The Albuquerque Police Department and the FBI attempted to locate the robber, searching the neighborhood. Id. at 183. The neighborhood search was not successful.

Agent Figura received information making the defendant Hawkins a suspect and she then obtained a photograph of Mr. Hawkins. She put it in a photo spread with five other photographs. Id. at 184-85. She then took the photo spread over to the Norwest Bank to show the two tellers, Holly Revelles and Holly Roybal. They identified position number five as the suspect, the position in which the photo of Mr. Hawkins was placed in the photo spread. This was on the day of the robbery. Id. at 185. Agent Figura then prepared an affidavit for an arrest warrant for defendant Hawkins. Agent Figura was then asked and identified Mr. Hawkins as sitting at the defense table. She said he was in position number five on the photo spread. Id. at 186. The arrest of Mr. Hawkins occurred the next day, March 26, about 4:25 p.m. Id. at 186. Agent Figura also prepared a search warrant for the residence at which Mr. Hawkins lived with his parents at 1516 Williams. Other members of the FBI executed the search warrant. Id. at 186.

The search began at 4:40 p.m. after the defendant's arrest in the neighborhood around his house where he was found a block away. Id. at 187. Agent Figura identified in her testimony Exhibit 5, which was one of the photographs from the office where defendant was photographed and processed the day after the bank robbery. Id. at 188. Exhibit 3 was identified as a photo of defendant taken of the right side of defendant's neck. Id. at 188. Ms. Figura also received four photographs from the bank's surveillance camera which are represented in Government Ex. 1. Id. at 189. The counter was "dusted" for latent or unknown fingerprints. One that was found did not match Mr. Hawkins's print. II R. at 192.

At the house on Williams Street, the agents searched defendant's room and his possessions and the rest of the residence. Id. at 193. Searching throughout the entire house, nothing was found that related back to either the money or items of clothing identified in the videotape or a Jansport Bag. Id. at 193. The same was true of the residence of the girlfriend of defendant Hawkins. Nothing was found that would support what he was wearing or what he had taken from the bank. Id. at 194.

Hawkins was taken back to the FBI office and was given his Miranda warnings from a form. Hawkins waived his rights and gave a statement to Agent Figura. Id. at 194. This was at approximately 4:45 or 4:50 p.m., when Hawkins began talking with the agents. Agent Tresder asked the questions, and they talked with Hawkins for approximately 45 or 50 minutes. They asked Hawkins whether he had robbed the bank the day before, and he said he did not. Id. at 196-97. He said he had awakened around 10:00 that day, when his mother called him. Hawkins walked around the neighborhood for a while and then went to his friend's house around noon time.

On cross-examination, Agent Figura said they found about $137 at defendant's residence, but there were no $50 bills. Id. at 201. None of the bait money was found there. A shirt that was seized was found not to be the correct shirt that defendant had warned. Id. at 201. From the consensual search at the house of defendant's girlfriend, no evidence was seized. II R. at 202. So far as Agent Figura knew, defendant did not own any vehicle. Id. The agents searched everywhere that they knew of where defendant might have stored any money. Id.

The day Mr. Hawkins was arrested, he had a mustache. Id. at 203. The mustache on defendant was about the same when Agent Figura saw him the day after the robbery as it appeared in the courtroom. Id. Figura was asked to examine Government Ex. 2 and said that this photo looked the way defendant did. His sideburns, mustache and everything were a little cleaner, but almost the same as in the courtroom. Figura said the mustache was clearly visible. Id. at 204. Agent Figura said that if she noted "clean-shaven," that indicated that the person interviewed did not specifically mention facial hair. Id. at 206. The photo identified as Government Ex. 2 was one taken a few months earlier, at least. Id. at 206-07.