**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 11 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee and Cross-Appellant,

v.

DOLORAS CONTRERAS,

Defendant-Appellant and Cross-Appellee.

Nos. 95-2070 &
95-2126

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-92-486-15-JC)**

_____

Charles L. Barth (John J. Kelly, United States Attorney, with him on the briefs), Assistant United States Attorney, Albuquerque, New Mexico, for Plaintiff-Appellee and Cross-Appellant.

Vicki Mandell-King (Michael Gordon Katz, Federal Public Defender, with her on the briefs), Assistant Federal Public Defender for the Districts of Colorado and Wyoming, for Defendant-Appellant and Cross-Appellee.

_____

Before **BALDOCK,** and **BRORBY,** Circuit Judges, and **DANIEL,**[*] District Judge.

**BRORBY**, Circuit Judge.

_____

[*]  The Honorable Wiley Y. Daniel, United States District Judge for the District of Colorado, sitting by designation.

_____

Doloras Contreras was convicted in the United States District Court for the District of New Mexico on four counts in a multi-defendant, multi-count indictment. The trial court departed downward from the United States Sentencing Guidelines and sentenced Ms. Contreras to a 120-month term of imprisonment. Ms. Contreras appeals her conviction, and the United States appeals the trial court's decision to depart downward. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Gabriel Rodriguez-Aguirre ("Mr. Aguirre") managed a family-run organization specializing in the sale and distribution of large amounts of marijuana and cocaine. *United States v. Denogean*, 79 F.3d 1010, 1011 (10th Cir.), *cert. denied*, 117 S. Ct. 154 (1996). "Between 1984 and 1992, the ... organization sold more than 20,000 pounds of marijuana and over 20,000 pounds of cocaine to narcotics traffickers in New Mexico, Arizona, Utah, Kansas, Massachusetts, and elsewhere throughout the United States." *Id.* The organization used narcotics proceeds to purchase real property and other assets. *Id.*

Doloras Contreras is the daughter of Mr. Aguirre. From December 1986 until October 1992, Ms. Contreras lived at a residence located in Phoenix, Arizona. During this time, Ms. Contreras used her residence to store large amounts of marijuana, cocaine, and United States currency derived from the sale of controlled substances. Ms. Contreras participated in the possession and conspiracy to distribute at least 3,080 pounds of cocaine and was involved in laundering $365,400.00 of illegally-derived currency.

On October 19, 1992, the United States filed a civil complaint for forfeiture of property in the District of New Mexico entitled *United States v. Fifty-One Items of Real Property, etc.*, No. CIV 92-1155-JC. Although Ms. Contreras was one of the named claimants, she never filed a claim or answer. Consequently, the United States District Court entered a partial default judgment against Ms. Contreras and others named in the civil forfeiture complaint.

The United States filed another civil forfeiture action against Ms. Contreras in January 1993 entitled *United States v. 247 Horses*, No. CIV 93-0102-JC. Once again, Ms. Contreras did not file a claim or answer, and the court entered a partial default judgment against Ms. Contreras.

On October 20, 1992, the United States charged Ms. Contreras and twenty-one others, including Mr. Aguirre, in a bill of indictment filed in the District of New Mexico. The twenty-three count bill of indictment charged Ms. Contreras with conspiracy to distribute more than 100 grams of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (1994), and three counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Supp. 1996). The United States based the money laundering counts on purchases of a residence in Glendale, Arizona, a Nissan Pathfinder automobile at Lou Grubb Chevrolet, and eleven horses. Ms. Contreras pled not guilty to the charges against her and proceeded to trial with her co-defendants in January 1994.

The original trial of Ms. Contreras and her co-defendants lasted six months, becoming "the longest federal criminal trial ever held in the District of New Mexico." *United States v. Rodriguez-Aguirre*, 73 F.3d 1023, 1024 (10th Cir. 1996). After deliberating for more than six weeks, the jury was unable to reach a verdict on the majority of counts, and the trial judge declared a mistrial. *Id.* Neither the United States nor counsel for Ms. Contreras objected to the mistrial.

In August 1994, the United States obtained a superseding indictment against Ms. Contreras and nine of her co-defendants. In addition to the charges

-4-

included in the original indictment, the superseding indictment contained additional charges against Ms. Contreras. Count II charged Ms. Contreras with conspiracy to possess with the intent to distribute cocaine, and conspiracy to distribute cocaine. Count XIX charged Ms. Contreras with receiving income from the distribution of controlled substances, and investing this income in Amador Investors,[1] in violation of 21 U.S.C. § 854 (1994). Although Ms. Contreras moved to dismiss the superseding indictment due to vindictive prosecution, the trial court summarily denied her motion.

The United States retried Ms. Contreras and her co-defendants in November and December 1994. Prior to trial, the court randomly selected a jury panel of approximately 250 jurors at random from voter registration lists for the Roswell Division of the District of New Mexico. The district judge excused 132 jurors *sua sponte* after individually reviewing the juror questionnaires; the court directed only 115 jurors to report for jury service. Six days prior to trial, defense counsel were provided copies of juror questionnaires for the panel that had been selected for service, and defense counsel learned the court had excused the remaining

---

[1] Amador Investors was a real estate business Ms. Contreras became involved with in 1990. (Vol. 40 at 4909-10.) Although she performed no work for the company, Ms. Contreras received a salary from Amador Investors and used a company credit card for personal expenses. (*Id.* at 4910-11, 4913-16.)

jurors.

On the first day of trial, prior to jury selection, Mr. Aguirre filed a motion to stay the proceedings, and defendant David Morales filed a motion to quash the jury venire.[2] The motions alleged the jury venire panel seriously misrepresented the ethnic makeup of the District of New Mexico. Specifically, the defendants claimed persons of Hispanic origin and American Indian background were underrepresented. The defendants sought a stay of the trial to allow time for an investigation of the ethnic background of all the jurors. In addition, Mr. Morales' counsel, Paul Kennedy, advised the court orally of *United States v. Calabrese*, 942 F.2d 218 (3d Cir. 1991), which Mr. Kennedy claimed stood for the proposition that it is reversible error for a court to exclude a juror prior to voir dire "simply because a juror knows a defendant." Mr. Kennedy claimed it appeared the court had excused at least one juror because the juror stated he or she knew one of the defendants.

Following Mr. Kennedy's comments, the court held an evidentiary hearing

---

[2] Pursuant to the court's order that "one motion made by one defense counsel applies to all [defendants]," all the defendants, including Ms. Contreras, adopted the motions of Mr. Aguirre and Mr. Morales.

and Nancy Metzger, jury administrator for the Federal Court Clerk's office, testified. Ms. Metzger stated the jury panel of approximately 250 jurors had been selected at random from voter registration lists. Ms. Metzger testified the district judge reviewed the juror questionnaires and directed her to excuse more than 100 specific jurors. Ms. Metzger stated she did not know the ethnicity of either the excused jurors or the jurors who had reported for service.

The court then stated it had reviewed the individual juror questionnaires and "retained the stack of those who, for some reason or other, claimed that they couldn't serve." The court explained:

> I think it goes without saying that the ones that were not summoned, I never looked at the last name, whether it was [a] Hispanic surname or whether it was not a Hispanic surname, or whether they were American Indians or not. As a matter of fact, I'm not real sure that that's part of the questionnaire --

Ms. Metzger confirmed the questionnaire forms did not direct the jurors to provide their ethnicity.

The district court denied the defendants' motion to stay the proceedings and the defendants' motion to quash the jury venire. However, the court allowed the defendants to supplement the record within ten days of the completion of the trial with information concerning the racial composition of the District of New Mexico

and the Roswell Division.  None of the defendants chose to supplement the record with such information.

The trial of Ms. Contreras and her co-defendants lasted approximately one month.  On December 15, 1994, the jury returned a verdict against Ms. Contreras on four counts -- conspiracy, investment of illicit drug profits, and two counts of money laundering.  At sentencing, the trial court adopted the factual findings and guideline application in Ms. Contreras' presentence report.  Thus, the court determined Ms. Contreras had a base offense level of 38, a criminal history category of I, and a guideline range of 235 to 293 months.  Nevertheless, the court found Ms. Contreras' guideline range to be substantially higher than that applied to co-defendant Paula Denogean, who the court concluded "was at least equally or maybe even ... more culpable than [Ms. Contreras]."[3]  To avoid an "unwarranted disparity of sentences," the court granted Ms. Contreras' motion for a downward departure and sentenced Ms. Contreras to 120 months based upon an adjusted base offense level of 31 and a sentencing range of 108-135 months.

_____

[3]  Ms. Denogean was severed out of the second trial due to illness and entered into a plea agreement by which she admitted her responsibility in possessing with the intent to distribute in excess of 100 kilograms of marijuana. The court sentenced Ms. Denogean to an 84 month term of imprisonment pursuant to Fed. R. Crim. P. 11(e)(1)(c).

## II. ISSUES RAISED ON APPEAL

Ms. Contreras' appeal raises four issues: (1) whether the United States obtained her criminal convictions in violation of the Fifth Amendment's protection against double jeopardy; (2) whether the superseding indictment filed after the mistrial should have been dismissed on grounds of prosecutorial vindictiveness; (3) whether the evidence was sufficient to support Ms. Contreras' conviction on Count XVIII, money laundering; and (4) whether the district court's pre-*voir dire* jury selection procedures violated Ms. Contreras' constitutional rights or her rights under the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861-1878 (1994)[4]. The government's cross-appeal raises one issue: whether the trial court erred in departing downward from the applicable guideline range to avoid a perceived disparity in sentences between Ms. Contreras and co-defendant Paula Denogean. Ms. Contreras contends the government's appeal should be dismissed as untimely filed.

---

[4] Ms. Contreras did not raise the jury selection issue in her briefs on appeal. However, on November 4, 1996, Ms. Contreras filed a motion to adopt this issue from the briefs of her co-defendants, David Morales, Gabriel Aguirre-Rodriguez, and Eleno Aguirre. We hereby grant Ms. Contreras' Motion to Adopt.

-9-

## III.  ANALYSIS

### A.  Ms. Contreras' Appeal

#### 1.  Double Jeopardy

Ms. Contreras first claims her criminal convictions should be dismissed because they were obtained in violation of the Fifth Amendment's prohibition against double jeopardy.  According to Ms. Contreras, the judicial forfeiture proceedings that preceded her criminal convictions served to adjudicate her personal culpability.  Thus, upon entry of default judgment in these proceedings, Ms. Contreras contends jeopardy attached, precluding the United States from instituting criminal proceedings against her based on the same underlying conduct.

Fed. R. Crim P. 52(b) provides a court of appeals with a limited power to correct errors that were not raised in district court.  *United States v. Olano*, 507 U.S. 725, 731 (1993).  Under this rule, an appeals court has discretion to review a forfeited error if the error is "plain" and "affect[s] substantial rights."  *Id.* at 732; *see also* Fed. R. Crim. P. 52(b).  However, the court should not exercise that discretion unless the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  *Olano*, 507 U.S. at 732 (quoting *United States v. Young*, 470 U.S. 1 (1985).  Here, Ms. Contreras' double jeopardy claim,

if established, would be a plain error affecting the fairness of the district court proceedings. Thus, we exercise our discretion under Rule 52(b) and review Ms. Contreras' double jeopardy claim for plain error.[5]

In *United States v. Ursery*, ___ U.S. ___, ___, 116 S. Ct. 2135, 2138-39 (1996), the government instituted civil forfeiture proceedings against defendant Guy Ursery's home, alleging the home had been used to facilitate the processing and distribution of marijuana. The government subsequently charged Mr. Ursery with manufacturing marijuana, and a jury convicted him on the charge. *Id.* On appeal, the Sixth Circuit reversed Mr. Ursery's criminal conviction on the grounds the conviction violated the Fifth Amendment's Double Jeopardy Clause. *Id.* Thereafter, the Supreme Court granted certiorari to determine the issue of whether a civil forfeiture constitutes punishment for purposes of the Double Jeopardy Clause. *Id.* at 2138. In analyzing this issue, the Court noted that "[s]ince the

---

[5] Ms. Contreras alleges she asserted the double jeopardy issue in "her supplement to Aguirre's motion in arrest of judgment." Unfortunately, Ms. Contreras does not provide the court with the record cite to this alleged document, in violation of Tenth Circuit Rule 28.1. After an exhaustive search of the docket sheet and the entire record, the court has been unable to locate any document entitled "supplement to Aguirre's motion in arrest of judgment." Furthermore, the court has been unable to find any place in the record where Ms. Contreras raised the double jeopardy issue before the district court. Consequently, we review the double jeopardy issue for plain error.

-11-

earliest years of this Nation, Congress has authorized the Government to seek parallel *in rem* civil forfeiture actions and criminal prosecutions based upon the same underlying events." *Id.* at 2140 (citations omitted). Concluding Congress intended *in rem* civil forfeiture to be a "remedial civil sanction, distinct from potentially punitive *in personam* civil penalties such as fines," the Court ruled civil forfeitures are neither "punishment" nor "criminal" for purposes of the Double Jeopardy Clause. *Id.* at 2141-42, 2149. Consequently, the Court held the government could constitutionally pursue both civil forfeiture and criminal charges against Mr. Ursery. *Id.* at 2149.

Since civil forfeiture proceedings do not constitute punishment under the Double Jeopardy Clause, Ms. Contreras was not placed in jeopardy by either of the civil forfeiture proceedings brought against her. Only the criminal proceedings subjected Ms. Contreras to punishment for purposes of double jeopardy. Thus, Ms. Contreras' criminal convictions did not violate the Fifth Amendment's Double Jeopardy Clause.

This court's holding in *Denogean*, a case involving Ms. Contreras' co-defendant, Paula Denogean, also is dispositive of Ms. Contreras' double jeopardy claim. 79 F.3d at 1010. There, Ms. Denogean argued her drug-related conviction

violated the Double Jeopardy Clause because it was obtained subsequent to civil forfeiture proceedings. *Id.* at 1012. We dismissed Ms. Denogean's appeal on the grounds she failed to judicially contest the United States' forfeiture action. *Id.* at 1013. Relying on prior Tenth Circuit case law, we held "a defendant's failure to judicially contest a civil forfeiture action is fatal to her double jeopardy challenge to a subsequent criminal proceeding." *Id.*

Similar to Ms. Denogean, Ms. Contreras did not contest the civil forfeiture proceedings brought against her. Thus, under *Denogean*, Ms. Contreras was a non-party who was not placed at risk by the forfeiture proceedings. "[W]ithout risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy." *Id.* (internal quotation marks omitted).

### 2. Prosecutorial Vindictiveness

Ms. Contreras next argues the district court should have dismissed the superseding indictment due to prosecutorial vindictiveness. Following the mistrial, the government filed a superseding indictment expanding the charges against Ms. Contreras to include possession with the intent to distribute and distribution of cocaine, and to include another count against Ms. Contreras

relating to her investment of funds in Amador Investors. Ms. Contreras contends the new charges were known to the government prior to the first trial and were motivated by vindictiveness.

The Supreme Court has stated the very purpose of instituting criminal proceedings against an individual is to punish; therefore, the mere presence of a punitive motivation behind prosecutorial action does not render such action constitutionally violative. *United States v. Goodwin*, 457 U.S. 368, 372 (1982). However, "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)).

While a prosecutor may penalize a defendant for violating the law, a prosecutor may not punish a defendant for "exercising a protected statutory or constitutional right." *Goodwin*, 457 U.S. at 372. Therefore, our focus in analyzing a claim of prosecutorial vindictiveness must be whether "'as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or punitive animus toward the defendant *because he exercised his specific legal right*.'" *United States v. Raymer*, 941 F.2d 1031, 1042 (10th Cir. 1991) (emphasis added) (quoting *United States v. Gallegos-*

*Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982)).

Since vindictive prosecution claims often turn on the facts of the case, we review a district court's factual findings under the clearly erroneous standard, while we review the legal principles guiding the district court *de novo*. *Raymer*, 941 F.2d at 1039 (citing *United States v. Schoolcraft*, 879 F.2d 64, 67 (3d Cir.), *cert. denied*, 493 U.S. 995 (1989)). To establish a claim of vindictive prosecution, the defendant must show either: (1) actual vindictiveness or (2) a reasonable likelihood of vindictiveness, which then raises a presumption of vindictiveness. *Raymer*, 941 F.2d at 1040. Once the defendant successfully establishes either, the burden shifts to the prosecution to justify its decision with "legitimate, articulable, objective reasons." *Id.* If the defendant is unable to prove actual vindictiveness or a realistic likelihood of vindictiveness, a trial court need not reach the issue of government justification. *Id.*

In the present case, Ms. Contreras does not assert an actual vindictiveness claim; rather, she contends the circumstances surrounding the enhancement of charges were such that a reasonable likelihood of vindictiveness exists. We disagree.

Generally, where, as here, a modification in a charging decision follows a mistrial occurring for neutral reasons, such as a hung jury, and without objection from the government, no presumption of vindictiveness is raised because there is no reason why the prosecutor would consider the defendant responsible for the need for a new trial. *United States v. Doran*, 882 F.2d 1511 (10th Cir. 1989). Nevertheless, the Supreme Court has refused to adopt *per se* rules in the prosecutorial vindictiveness context. *Id.* at 1521. Consequently, to determine whether a reasonable likelihood of vindictiveness exists, we must look to the totality of the objective circumstances surrounding the prosecutorial decision. *Id.*

In *Doran*, the defendant was tried on two counts in a multi-defendant, multi-count indictment. 882 F.2d at 1513-14. During the trial, the defendant's attorney was hospitalized, and the court declared a mistrial. *Id.* at 1513. Thereafter, the defendant filed a motion to dismiss the indictment under the Speedy Trial Act, and the district court orally dismissed that motion. *Id.* Contemporaneous with the defendant's appeal of the motion to dismiss, the government filed a superseding indictment adding five counts against him. *Id.* Following the defendant's trial and conviction on the charges in the superseding indictment, the defendant appealed to this court arguing, *inter alia,* prosecutorial vindictiveness motivated the additional counts. *Id.* at 1518, 1527.

-16-

Because the government added the new charges against Mr. Doran after the assertion of his speedy trial rights, we applied a "totality of the circumstances" test to conclude there was no reasonable likelihood that improper prosecutorial vindictiveness motivated the government to impose the new charges.[6] *Id.* at 1520-21.

In the instant case, the objective circumstances surrounding the prosecutor's decision to increase the charges against Ms. Contreras are as follows. The district court declared a mistrial in the original trial of Ms. Contreras after more than six weeks of jury deliberations. *Rodriguez-Aguirre*, 73 F.3d at 1024. The court declared a mistrial because the jury was unable to reach a verdict, and neither the prosecution nor the defense objected to the mistrial. Following the mistrial, the government received some negative publicity from the media. Prior to Ms. Contreras' second trial, the government filed a superseding bill of indictment adding new charges against her. The government was aware of the information pertinent to the added cocaine charges prior to Ms. Contreras' first trial.

---

[6] We found only two facts in *Doran* supported an inference of vindictiveness: (1) the United States added the charges after Doran asserted his speedy trial rights, and (2) the United States had already spent considerable time analyzing the evidence and determining the appropriate charges prior to the first trial. *Id.* These facts were insufficient to create a presumption of prosecutorial vindictiveness. *Id.* at 1521-23.

We find the above circumstances, coupled with the fact Ms. Contreras failed to exercise a specific legal right, insufficient to create a presumption of prosecutorial vindictiveness. The United States filed the superseding indictment after a mistrial was declared, without objection, for neutral, uncontrollable reasons. Consequently, the specter of prosecutorial animosity is not raised. Although the United States suffered some adverse media coverage following the mistrial, we are not persuaded the superseding indictment was filed in retaliation for the negative publicity. Given the fact a presumption of prosecutorial vindictiveness was not raised in *Doran* where additional charges were filed contemporaneous with the assertion of the defendant's Speedy Trial rights, we do not see how such a presumption could arise in this case from negative press coverage. Moreover, we do not believe a presumption of vindictiveness flows from the United States' knowledge of Ms. Contreras' involvement in cocaine trafficking prior to the first trial. The overall complexity of this multi-indictment, multi-defendant case "permit[s] a reasonable inference that given extra time to analyze the evidence, the Government legitimately decided the new theory of liability was appropriate." *See Doran*, 882 F.2d at 1522. We therefore conclude Ms. Contreras has failed to create a presumption of prosecutorial vindictiveness.

### 3. Money Laundering

Finally, Ms. Contreras argues the evidence at trial was insufficient to support her conviction on Count XVIII, money laundering. In reviewing the sufficiency of the evidence in a criminal case, "'[t]he evidence --both direct and circumstantial, together with reasonable inferences to be drawn therefrom -- is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" *United States v. Sanders*, 929 F.2d 1466, 1470 (10th Cir.) (quoting *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128 (1986)), *cert. denied*, 502 U.S. 846 (1991).

The jury in this case convicted Ms. Contreras of violating 18 U.S.C. § 1956(a)(1)(B)(i) in purchasing a Nissan Pathfinder. To obtain a conviction under this statuts, the government is required to prove the following four elements beyond a reasonable doubt:

(1) the defendant engaged in a financial transaction;

(2) the defendant knew the property involved in the transaction represented the proceeds of unlawful activities;

(3) the property involved was in fact the proceeds of unlawful activity; and

(4) the defendant knew the transaction was designed "in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

18 U.S.C.A. § 1956(a)(1)(B)(i) (Supp. 1996); *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1473 (10th Cir. 1994). On appeal, Ms. Contreras contends the United States failed to prove the fourth element of money laundering -- that is, Ms. Contreras purchased the Nissan Pathfinder with the intent to conceal. According to Ms. Contreras, the purchase of the automobile demonstrates no more than "money spending"; the evidence only indicates Mr. Aguirre "openly and conspicuously" purchased the car for his daughter's personal use.

In enacting 18 U.S.C.A. § 1956(a)(1)(B)(i), Congress did not intend to create a statute punishing mere "money spending." *See Sanders*, 929 F.2d at 1474. Rather, Congress designed the money laundering statute to "reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." *Sanders*, 929 F.2d at 1472. A money laundering conviction need not be supported by evidence of the launderer's intent to conceal his or her *identity* while conducting the transaction. *Garcia-Emanuel*, 14 F.3d at 1473. "'[T]he statute is aimed broadly at transactions designed in whole or in part to conceal or disguise *in any manner* the nature, location, source, ownership or control of the proceeds of unlawful activity.'" *Id.* (emphasis in original) (quoting *United States v. Lovett*, 964 F.2d

-20-

1029, 1034 n.3 (10th Cir.), *cert. denied*, 506 U.S. 857 (1992)).

As we noted in *Garcia-Emanuel*, separating money laundering from mere money spending is often a formidable task. 14 F.3d at 1474. In ascertaining whether the requisite intent to disguise or conceal was present, we consider a variety of types of evidence including: statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; and expert testimony on practices of criminals. *Id.* at 1475-76. Of course, this is not an exclusive list of factors for a court to consider when determining whether a defendant possessed the intent to disguise or conceal. *Id.* at 1476.

The evidence in the present case reveals Ms. Contreras purchased a Nissan Pathfinder from co-defendant Art Rubio, a salesman at Lou Grubb Chevrolet. The car was purchased by way of a $25,000.00 Bancomer check. The check, made payable to Lou Grubb, was signed by a Bancomer official and drawn on the account of Texas Commerce Bank in El Paso, Texas. The check lists no remitter,

and it is impossible to determine the funds' source from the face of the check. Given the vague and highly unusual attributes of the check used to purchase a vehicle for personal use, a reasonable jury could have concluded the evidence demonstrated Ms. Contreras' intent to disguise the illicit source of the funds. Thus, we find sufficient evidence supports Ms. Contreras' conviction on Count XVIII, money laundering.

### 4. Jury Selection

Ms. Contreras contends the district court's *sua sponte* excusal of over half of the jury panel, prior to *voir dire*, violated the Jury Selection and Service Act, as well as Ms. Contreras' constitutional rights. We review Ms. Contreras' statutory challenge and constitutional claims separately.

### a. Jury Selection and Service Act

Ms. Contreras first contends the district court's pre-*voir dire* excusals violated the Jury Selection and Service Act of 1968. In general, "[t]he trial judge is vested with a wide discretion for determining the competency of jurors and his judgment will not be interfered with except in the case of an abuse of discretion." *United States v. Porth*, 426 F.2d 519, 523 (10th Cir.) (internal quotation marks omitted), *cert. denied*, 400 U.S. 824 (1970). However, to the extent Ms.

Contreras' contentions rest on statutory interpretations of the Jury Selection and Service Act, we review the district court's decisions *de novo* to determine whether the jury selection process failed to substantially comply with the Jury Selection and Service Act. 28 U.S.C. § 1867 (1994); *United States v. Bailey*, 76 F.3d 320, 321 (10th Cir.), *cert. denied*, 116 S. Ct. 1889 (1996).

The Jury Selection and Service Act of 1968 governs the selection of grand and petit juries in federal court, and "seeks to ensure that potential grand and petit jurors are selected at random from a representative cross section of the community and that all qualified citizens have the opportunity to be considered for service." *United States v. Bearden*, 659 F.2d 590, 593 (5th Cir. 1981) (citing 28 U.S.C. § 1861), *cert. denied*, 456 U.S. 936 (1982). To achieve these objectives, the Jury Selection and Service Act requires each United States District Court to devise a written plan for the random selection of jurors. 18 U.S.C. § 1863. While the Jury Selection and Service Act provides the district court with a reasonable degree of flexibility in designing a plan to accommodate local conditions, the regulation prescribes a general procedural scheme to be followed. *Id.*; *Bearden*, 659 F.2d at 594.

Section 1866(c) of the Jury Selection and Service Act sets forth the

circumstances under which a qualified juror may be removed from service. The section provides, in pertinent part, as follows:

> [e]xcept as provided in section 1865 of this title or in any jury selection plan provision ..., no person ... shall be disqualified, excluded, excused, or exempt from service as jurors: *Provided*, That any person summoned for jury service may be (1) excused by the court, or by the clerk under supervision of the court if the court's jury selection plan so authorizes, upon a showing of undue hardship or extreme inconvenience, ... or (2) excluded by the court on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings, or (3) excluded upon peremptory challenge as provided by law, or (4) excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown, or (5) excluded upon determination by the court that his service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations.

28 U.S.C. § 1866(c). This section further provides that a juror may not be excluded under category (5) unless the court determines, in open court, that such an exclusion is warranted. *Id.*

A party challenging the jury selection process under the Jury Selection and Service Act must make his challenge "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." 28 U.S.C. § 1867(a). The motion must contain a "sworn statement of facts which, if true, would constitute a substantial failure to comply with the [Jury Selection and

-24-

Service Act]." 18 U.S.C. § 1867(d). The Jury Selection and Service Act's procedural requirements are designed to give the district court an opportunity to evaluate the alleged noncompliance and to correct such noncompliance before precious judicial resources are invested in a trial. Strict compliance with these procedural requirements is essential. *See United States v. Kennedy*, 548 F.2d 608, 612-14 (5th Cir.), *cert. denied*, 434 U.S. 865 (1977).

In the present case, we must first determine whether Ms. Contreras sufficiently complied with the procedural requirements of the Jury Selection and Service Act. The United States contends Ms. Contreras' challenge to the district court's jury selection process is barred by the defendants' failure to file a sworn affidavit with their motions challenging the selection of the jury. Although Ms. Contreras concedes a sworn statement of facts was not filed with the defendants' motions, she argues such an affidavit should be excused in this case. According to Ms. Contreras, the testimony elicited from the court and the jury administrator on the first day of trial served as an adequate substitute for the sworn affidavit requirement. See *Calabrese*, 942 F.2d at 222.

As noted, courts have strictly enforced the procedural requirements of the Jury Selection and Service Act, including the sworn statement requirement. In

*Kennedy*, the Fifth Circuit concluded the district court's emergency use of volunteer jurors constituted a substantial failure to comply with the Jury Selection and Service Act. 548 F.2d at 612. Nevertheless, the court affirmed the defendant's conviction because the defendant failed to accompany his motion challenging the jury panel with a sworn statement. *Id.* at 613. Finding Congress left no room for "ad hoc review" of the sworn statement requirement's usefulness, the court explained:

> In the [Jury Selection and Service] Act, Congress set out a uniform, relatively strict scheme for jury selection. Congress included a new remedy for substantial violations of the Act, regardless of whether the litigant challenging the jury had been prejudiced by the jury selection. As a price for this remedy, Congress was entitled to exact strict compliance with formal procedural rules.

*Id.*

Similarly, in *United States v. Cooper*, 733 F.2d 1360, 1362, (10th Cir.), *cert. denied*, 467 U.S. 1255 (1984), defendant Darryl Threat, who was convicted of aiding and abetting the passing of counterfeit money, argued to this Circuit the jury selection process did not insure "a jury selected at random from a fair cross section of the community." *Id.* at 1366. In reviewing Mr. Threat's contention, we noted "a defendant is required [under Section 1867(d)] to submit a sworn statement of facts ..., which if true would constitute a failure to comply with the provisions of the [Jury Selection and Service] Act." *Id.* at 1366. Finding no

evidence that Mr. Threat filed a sworn affidavit with the district court, we rejected Mr. Threat's claim and affirmed his conviction. *Id; see also United States v. Maldonado*, 849 F.2d 522, 523 (11th Cir. 1988) (defendant failed to preserve objection to jury selection because no sworn statement was submitted with motion); *United States v. LaChance*, 788 F.2d 856, 876 (2d Cir.) (untimely motion that did not contain sworn statement of facts properly denied), *cert. denied*, 479 U.S. 883 (1986)*; United States v. Wellington*, 754 F.2d 1457, 1468 (9th Cir.) (defendant's failure to file sworn statement precluded relief), *cert. denied*, 474 U.S. 1032 (1985); *United States v. Foxworth*, 599 F.2d 1, 3 (1st Cir. 1979) (report filed with motion was not sworn and therefore precluded challenge to jury selection process).

Other circuits have so strictly construed the sworn statement requirement they have dismissed a Jury Selection and Service Act claim where a defendant has filed a sworn statement, but the sworn statement has been insufficient to satisfy § 1867(d). For example, in *United States v. Paradies*, 98 F.3d 1266, 1277-78 (11th Cir. 1996), *petition for cert. filed*, (U.S. Feb. 21, 1997) (No. 96-1346), the defendants filed a sworn statement along with a timely motion objecting to the district court's *sua sponte* excusal of over seventy potential jurors prior to *voir dire*. However, the Eleventh Circuit concluded the defendants' challenge to the

jury selection process was barred because the sworn affidavit did "not state facts which, if true, would [have] constitute[d] *any* violation of the Jury Selection Act." (Emphasis in original.)  *Id.* at 1278-79; *see also United States v. Percival*, 756 F.2d 600, 614-15 (7th Cir.1985) (trial court properly denied challenge to jury selection where sworn statement did not constitute substantial failure to comply with Jury Selection and Service Act).

Notwithstanding the enormous weight of authority to the contrary, Ms. Contreras contends her failure to file a sworn statement is not fatal to her claim under the Jury Selection and Service Act.  Relying upon the Third Circuit's decision in *Calabrese*, Ms. Contreras contends the evidentiary hearing held on the first day of trial served as an adequate substitute for the sworn affidavit requirement.  In *Calabrese*, the district court excused twelve jurors prior to *voir dire* because the jurors stated they knew one of the defendants.  942 F.2d at 221. The defendants timely objected to the district court's exclusions, but failed to file a sworn statement of facts.  *Id.* at 222.  To satisfy the requirements of § 1867(d), the defendants relied upon the sworn testimony of the clerk of court who had granted the allegedly unwarranted exclusions.[7]  *Id.*  The Third Circuit held the

_____

[7]  The clerk testified immediately after the defendants objected to the district court's exclusions.

-28-

clerk's sworn testimony satisfied the sworn statement requirement. *Id.* Noting the clerk's testimony "contained undisputed facts, sufficient to provide the district court with a basis for making a decision," the district court held the clerk's sworn testimony sufficiently complied with the procedural requirements of the Jury Selection and Service Act. *Id.*

It appears the Third Circuit is the only court that has recognized a substitute to the sworn affidavit requirement. Ms. Contreras has not provided any case law other than *Calabrese* in support of her position, and our independent research has failed to unearth any other cases recognizing an exception to the sworn statement requirement. Based on our thorough review of all relevant authorities, we conclude the exception created by the Third Circuit in *Calabrese* is contrary to the overwhelming weight of authority, and we refuse to recognize this exception. 28 U.S.C. § 1867(d) unequivocally requires a motion challenging jury selection procedures to contain "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the [Jury Selection and Service Act]." Congress has determined the procedures prescribed under § 1867 "shall be the exclusive means" by which a person may challenge jury selection procedures. 28 U.S.C. § 1867(e).

The circuit courts, including the Tenth Circuit, have overwhelmingly interpreted the Jury Selection and Service Act's sworn statement requirement strictly. Based on the plain language of § 1867(d), and the previously cited cases strictly interpreting this provision, we refuse to recognize the substitute to the sworn statement requirement recognized by the Third Circuit in *Calabrese*. As a result, Ms. Contreras' claim under the Jury Selection and Service Act is precluded due to the defendants' failure to accompany their motions challenging the jury selection process with a sworn affidavit.

### b. Sixth Amendment Fair-Cross-Section Claim

Ms. Contreras argues the district court's pre-*voir dire* excusal of over half the jury panel resulted in a venire panel that underrepresented Hispanics, thus violating her Sixth Amendment rights. We review the district court's factual determination that the jury panel did not underrepresent Hispanics for clear error. *United States v. McKinney*, 53 F.3d 664, 670 (5th Cir.), *cert. denied*, 116 S. Ct. 261 (1995).

The Supreme Court has declared "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528

(1975). Although a petit jury need not "mirror the community," jury panels or venires "must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* at 538. To establish a *prima facie* violation of a defendant's right to a jury drawn from a fair cross section of the community, the defendant must show: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in jury venires is not fair and reasonable in relation to the number of such persons in the community; and (3) the underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

In the present case, Ms. Contreras cannot prevail on her "fair-cross-section" claim because the defendants failed to establish the second prong of the prima facie case. To show a jury panel has seriously underrepresented a distinctive group, the defendant must first demonstrate the percentage of the community made up of the group allegedly underrepresented, "for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement." *Id.* After denying the defendants' motion to quash the jury venire panel on the first day of trial, the district court granted the defendants permission to supplement the record with evidence concerning the racial composition of the Roswell Division of the

District of New Mexico within ten days of the completion of trial. None of the defendants supplemented the record with such information. Consequently, this court is unable to determine whether the number of Hispanics on the jury panel was not fair and reasonable in relation to the number of such persons in the New Mexico community.

Moreover, even if evidence existed tending to show Hispanics were seriously underrepresented on the jury panel, Ms. Contreras would still lack sufficient evidence to establish a *prima facie* case. Ms. Contreras has failed to prove any underrepresentation of Hispanics due to their systematic exclusion in the jury selection process. The evidence before this court indicates the contrary. On the first day of trial, the district judge explained he never looked at the last names of the jurors he excused from service prior to *voir dire*. Ms. Metzger confirmed that the juror questionnaires did not request the jurors to list their ethnicity. There is simply no evidence that any of the jurors were excused because of their ethnicity. Since Ms. Contreras has not established a *prima facie* case of a fair-cross-section violation, her claim must fail.

### c. Equal Protection

Ms. Contreras argues the district court's pre-*voir dire* exclusions also

violated her equal protection rights. To establish a *prima facie* case of equal protection violation, Ms. Contreras must prove: (1) she is a member of a group capable of being singled out for discriminatory treatment; (2) members of this group were substantially underrepresented on the venire; and (3) the venire was selected under a practice providing an opportunity for discrimination. *United States v. Grisham*, 63 F.3d 1074, 1081 (11th Cir. 1995) (citing *Cunningham v. Zant*, 928 F.2d 1006, 1013 (11th Cir. 1991)), *cert. denied*, 116 S. Ct. 798 (1996); *see also Jefferson v. Morgan*, 962 F.2d 1185, 1190 (6th Cir.) (citing *Batson v. Kentucky*, 476 U.S. 79, 95 (1986)), *cert. denied*, 506 U.S. 905 (1992). The defendant's failure to present evidence of the Hispanic population in New Mexico also prevents Ms. Contreras from establishing an equal protection case. Without such evidence, there is simply no means by which this court can determine whether Hispanics were substantially underrepresented on the jury panel.[8]

---

[8] Ms. Contreras appears to argue an equal protection *prima facie* case is established in light of the fact that there were significantly more Hispanics on the original panel of jurors than there were on the panel that remained after the district judge conducted his pre-*voir dire* excusals. Based upon the surnames of the excused jurors, 22 or 16.67 % of the 132 excused jurors were Hispanic. As for the 115 members of the jury venire, Ms. Contreras estimates only thirteen, or 11.3 per cent, were Hispanic. Assuming we can accurately calculate the number of Hispanics from the panel members' surnames, we do not believe the disparity between the percentage of Hispanics excused prior to *voir dire* and the percentage of Hispanics in the jury venire is statistically significant. *See United States v. Test*, 550 F.2d 577, 587 (10th Cir. 1976) (*prima facie* case of systematic exclusion not established by disparity of ten to sixteen percent) (relying on *Swain v. Alabama*, 380 U.S. 202, 205 (1965).

Moreover, it does not appear Ms. Contreras could prove the jury selection system provided an opportunity for discrimination. As stated, the record reveals ethnicity was not indicated on the juror questionnaires and the district judge testified he did not pay attention to the last names of the jurors he excluded.

### d. Sixth Amendment Right to Impartial Jury

Ms. Contreras argues for the first time on appeal that the district court violated her Sixth Amendment right to an impartial jury by excusing jurors without first conducting *voir dire.* Although we do not ordinarily consider arguments raised for the first time on appeal, *see Doelle v. Mountain States Tel. & Tel.*, 872 F.2d 942, 944 n.4 (10th Cir. 1989), we can easily dispose of Ms. Contreras' impartial jury claim.

As noted by Ms. Contreras, "*[v]oir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). However, we are aware of no authority holding a defendant's right to an impartial jury is violated per se by the pre-*voir dire* excusal of jurors. In fact, the Jury Selection and Service Act indicates the district court may properly exclude summoned

jurors prior to *voir dire* based on hardship or bias. *See* 28 U.S.C. § 1866(c).[9]

Other circuit courts have deemed certain pre-*voir dire* dismissals under 28 U.S.C.

§ 1866(c) to be proper. *See Calabrese*, 942 F.2d at 221, 228 (although court

improperly excused twelve jurors prior to *voir dire* based on their alleged

knowledge of a defendant, court's pre-*voir dire* excusal of 155 jurors based on

hardship not found erroneous); *United States v. North*, 910 F.2d 843, 909-10

(D.C. Cir. 1990) (pre-v*oir dire* excusal of jurors "for cause" not erroneous),

*superseded in part on other grounds*, 920 F.2d 940 (D.C. Cir. 1990), and *cert.*

*denied*, 500 U.S. 941 (1991).

Here, a thorough review of the excused-juror questionnaires reveals all but

perhaps two of the dismissed jurors were eligible under the Jury Selection and

Service Act for dismissal based on undue hardship or bias. We find the district

court did not abuse its discretion in dismissing these jurors. With respect to the

two jurors whose excusal is questionable under 28 U.S.C. § 1866(c), there is no

---

[9] 28 U.S.C. § 1866(c) sets forth five specific reasons a summoned juror may be excused by the district court. They are: (1) undue hardship; (2) inability to render impartial service; (3) peremptory challenge; (4) good cause shown; and (5) the court determines excusal is warranted and exclusion is not inconsistent with other provisions of the Jury Selection and Service Act. *Id.* Section 1867(c) provides the court may only exclude a person under clause (5) in open court. From this statement, we can logically infer that it may be permissible for a court to exclude a juror for hardship or bias prior to *voir dire*.

-35-

evidence either of these jurors was dismissed on account of their ethnicity. It appears one juror was dismissed because she may have known one of the defendants,[10] and the other was dismissed after stating on her questionnaire that she was unable to serve for confidential reasons. Even if the trial court acted improperly in dismissing these jurors prior to *voir dire*, *see Calabrese*, 942 F.2d at 228-30, we do not believe the error was sufficiently egregious to have violated Ms. Contreras' right to an impartial jury.[11]

---

[10] We need not decide the issue of whether a trial court has the discretion to dismiss a juror prior to *voir dire* due to a juror's acquaintance with one of the defendants. Although the Third Circuit determined a district court may not dismiss a juror prior to *voir dire* based on the juror's "mere acquaintance with one of the defendants," *see Calabrese*, 942 F.2d at 229, we note authority exists to the contrary. *See Paradies*, 98 F.3d at 1279-80 (trial court has discretion to excuse a juror based on acquaintance with defendant prior to *voir dire*) (relying on *United States v. Bailey*, 468 F.2d 652, 658 (5th Cir. 1972)).

[11] Ms. Contreras also alleges the district court violated Fed. R. Crim. P. 43 and 28 U.S.C. § 753(b) (1994) by failing to dismiss the 132 jurors in open court and in the presence of the defendants. Fed. R. Crim. P. 43 provides, in pertinent part, "the defendant shall be present ... at every stage of the trial including the impaneling of the jury." 28 U.S.C. § 753(b) requires the recording of "all proceedings in criminal cases had in open court." Notwithstanding Ms. Contreras' contentions to the contrary, neither Rule 43 nor 28 U.S.C. § 753(b) requires the excusal of all jurors to take place in open court in the presence of the defendants. As stated, the Jury Selection and Service Act permits the pre-*voir dire* excusal of jurors under certain circumstances. *See supra* at note 9. Circuit authority is in accord. *See id.* Thus, the district court's dismissal of the 130 jurors who were eligible for dismissal under 28 U.S.C. § 1866(c) did not violate Rule 43 or 28 U.S.C. § 753(b). To the extent the district court improperly dismissed two jurors in violation of these provisions, we conclude the errors were harmless to the defendants.

**B. United States' Appeal**

The United States contends the trial court erred in departing downward from the sentencing guidelines to avoid a perceived disparity in the sentences of Ms. Contreras and her co-defendant, Paula Denogean. In response to the United States' appeal, Ms. Contreras has filed a motion to dismiss. She argues the government's notice of appeal was not timely filed. We first review Ms. Contreras' motion to dismiss to ascertain whether we have jurisdiction to entertain the United States' appeal.

**1. Motion to Dismiss**

Fed. R. App. P. 4(b) provides, in pertinent part, that "[w]hen an appeal by the government is authorized by statute, the notice of appeal must be filed in the district court within 30 days after (i) the entry of the judgment or order appealed from or (ii) the filing of a notice of appeal by any defendant." A judgment or order is "entered" when it is entered on the criminal docket. Fed. R. App. P. 4(b). Here, the United States appeals from the district court's order granting Ms. Contreras' motion for a downward departure. The Clerk of Court entered this order on the criminal docket on May 19, 1995. Because the United States filed its notice of appeal on Monday, June 19, 1995, the appeal was filed within Rule 4(b)'s thirty-day time limit. We therefore deny Ms. Contreras' motion to dismiss.

## 2. Trial Court's Downward Departure

At sentencing, the trial court found Ms. Contreras had a base offense level of 38, a criminal history category of I, and a guideline range of 235 to 293 months. However, the court took "judicial notice that the guideline range applicable in this case is substantially higher than that applied to [co-defendant Paula Denogean] who was at least equally or maybe even ... more culpable than [Ms. Contreras]." To avoid an "unwarranted disparity of sentences," the court granted Ms. Contreras' motion for a downward departure and sentenced Ms. Contreras to 120 months based upon an adjusted base offense level of 31 and a sentencing range of 108-135 months.

The United States argues the trial court impermissibly departed downward from the applicable sentencing guideline range. According to the United States, Ms. Contreras and Ms. Denogean are not "similarly situated" defendants deserving of comparable sentences.

Recently, in *Koon v. United States*, 116 S. Ct. 2035, 2047 (1996), the Supreme Court held an appellate court should apply an abuse of discretion standard in reviewing a district court's decision to depart from the sentencing guidelines. The Court found "[a] district court's decision to depart from the

Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." *Id.* at 2046 (citation omitted). The Court reasoned district courts have an "institutional advantage" over appellate courts in making departure decisions since they deal with such determinations on a daily basis. *Id.* at 2046-47. Nevertheless, the Court also concluded that "whether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution of the point." *Id.* at 2047. "The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *Id.* at 2048.

In imposing a sentence, the district court shall consider, *inter alia*, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (1994). The court must impose a sentence within the guideline range unless it finds "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1994). For a departure from the sentencing guidelines to be proper, "'there must be something "special" about a given

offender, or the accouterments of the crime committed, which distinguishes the case from the mine-run for that offense.'"  *United States v. Wogan*, 938 F.2d 1446, 1448 (1st Cir.), *cert. denied*, 502 U.S. 969 (1991).  The guidelines were enacted to "'eliminate unwarranted disparities [in sentencing] nationwide.'"  *United States v. Garza*, 1 F.3d 1098, 1100 (10th Cir.) (quoting *United States v. Joyner*, 924 F.2d 454, 460 (2d Cir. 1991)), *cert. denied*, 510 U.S. 1018 (1993).  This circuit has stated "'neither Congress nor the [Sentencing] Commission could have expected that the mere fact of a difference between the applicable guideline range for a defendant than that of his co-defendant would permit a departure, either because the difference was too large or too small.'"  *Garza*, 1 F.3d at 1100 (quoting *Joyner*, 924 F.2d at 460.)

In *Garza*, the district court departed downward from defendant Ray Garza's guideline range based upon a disparity in the potential sentence of Mr. Garza and the sentence of his co-defendant.  1 F.3d at 1099.  Noting Mr. Garza and his co-defendant had similar records and were charged with similar conduct, the district court concluded "the great disparity between the two sentences warranted equalization."  *Id.* at 1100.  On appeal, we recognized our previous holding that "'[w]hile similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by

the facts on the record.'" *Id.* at 1101 (quoting *United States v. Goddard*, 929 F.2d 546, 550 (10th Cir. 1991)). We then analyzed whether Mr. Garza and his co-defendant were, in fact, similarly situated defendants. *Garza*, 1 F.3d at 1101. Concluding there was "no evidence of similarity in the participation, culpability, criminality, and conduct of Garza and [his co-defendant]," we reversed the district court's decision to depart downward. *Id.*

Here, as in *Garza*, we can determine whether the trial court abused its discretion in departing from the guidelines without deciding whether disparity in sentences between co-defendants is an appropriate basis for departure. The record reveals Ms. Contreras went to trial and was convicted on four counts -- conspiracy to possess with intent to distribute in violation of 21 U.S.C.A. § 846, investment of illicit drug profits in violation of 21 U.S.C.A. § 854, and two counts of money laundering in violation of 18 U.S.C.A. § 1956(a)(1)(B)(i). Ms. Denogean, on the other hand, accepted responsibility for her criminal conduct and pled guilty to a lesser charge of possession with intent to distribute marijuana. Co-defendants who are charged with and convicted of different offenses are not "similarly situated" with respect to the sentencing guidelines. *United States v. Butt*, 955 F.2d 77, 90 (1st Cir. 1992). Here, Ms. Contreras and Ms. Denogean are not "similarly situated." Ms. Contreras was convicted by a jury of four separate

offenses, while Ms. Denogean pled guilty to one offense. Given their distinct situations, we conclude the trial court abused its discretion in concluding an "unwarranted disparity" existed justifying downward departure.

In determining whether Ms. Contreras and Ms. Denogean are "similarly situated," Ms. Contreras appears to argue the court should focus on their respective roles in all of the offenses rather than the fact Ms. Denogean pled guilty to a lesser offense and Ms. Contreras was convicted by a jury on four counts. According to Ms. Contreras, she was "very willing" to plead guilty prior to trial and receive a five year sentence. However, she alleges the United States would not offer her a plea agreement because her father (Mr. Aguirre) would not assent to a plea bargain.

Although Ms. Contreras may have been as deserving of a plea bargain as Ms. Denogean, we must remind Ms. Contreras that entering into plea bargains is within the United States Attorney's prosecutorial discretion. "[S]ubstituting the judge's view of the proper general prosecutorial policy for that of the prosecutor [does not constitute] a valid ground for departure from the guideline range." *United States v. Stanley*, 928 F.2d 575, 583 (2d Cir.), *cert. denied*, 502 U.S. 845 (1991) (trial judge erred in departing downward because of disparity in sentence

between defendants who engaged in similar conduct but were charged with different offenses as result of prosecutor's plea bargaining decisions). In other words, a trial judge may not reduce a defendant's sentence on the mere basis that a co-defendant who engaged in similar conduct but agreed to plead guilty to lesser charges received a lighter sentence. Any rule to the contrary would invade the United States Attorney's broad prosecutorial discretion. Moreover, "allowing a defendant's sentence to be reduced on account of a codefendant's plea bargain may tend to discourage the government from offering plea bargains in cases involving multiple defendants." *United States v. Mejia*, 953 F.2d 461, 468 (9th Cir.), *cert. denied*, 504 U.S. 926 (1992). Such a result should be avoided in the interest of judicial economy. *Id.* In the case at bar, we therefore conclude the trial judge erred in reducing Ms. Contreras' sentence based upon the sentence of a co-defendant who pled guilty to a lesser charge.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's decision to depart downward, and we **REMAND** this case to the district court for resentencing consistent with this opinion. We **AFFIRM** the judgment of the district court in all other respects.