**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 6 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BOBBY G. PULLEN,

Defendant-Appellant.

No. 99-3226
(D.C. No. 98-CR-40080)
(D. Kan.)

**ORDER AND JUDGMENT** *

Before **BRORBY, PORFILIO,** and **MURPHY** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). Therefore, appellant's request for oral argument is denied, and the case is ordered submitted without oral argument.

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Defendant-appellant Bobby G. Pullen brings this pro se appeal of his federal conviction, following a jury trial, of one count of possession with intent to distribute approximately 320 pounds of marijuana, a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, with reference to 21 U.S.C. 841(b)(1)(B).  Mr. Pullen was sentenced to 262 months in prison followed by five years supervised release.  Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we affirm.

## I.  Background

On July 25, 1998, a Kansas Highway Patrol Officer, Lt. Kindlesparger, engaged in a high speed chase with Mr. Pullen after clocking him for speeding. Mr. Pullen attempted to evade Lt. Kindlesparger by driving through a highway construction zone on the shoulder.  Once Mr. Pullen was stopped, and while Lt. Kindlesparger was arresting him, his unattended truck rolled down an embankment into a ditch. [1]  As soon as back-up officers arrived at the scene, Lt. Kindlesparger went into the ditch to ascertain if there were any passengers in

---

[1]      Mr. Pullen was arrested for various state traffic violations including reckless driving, fleeing to elude an officer, and speeding.

-2-

the truck requiring assistance. [2] In the cab-enclosed bed of the truck, Lt. Kindlesparger discovered a large quantity of marijuana.

At this point, one of the other officers at the scene, Trooper Jason DeVore, had custody of Mr. Pullen, who was behaving in a verbally abusive and belligerent manner. Trooper DeVore testified that he read Mr. Pullen his *Miranda* warnings, placed him in the patrol car, and attempted to calm him down. At this point, Mr. Pullen confessed to Trooper DeVore that he had picked up the marijuana in Arizona and was delivering it to certain persons in Illinois. Trooper DeVore then approached Mr. Pullen about doing a controlled delivery of the marijuana. Once Mr. Pullen indicated his willingness to cooperate with a controlled delivery, Trooper DeVore transported Mr. Pullen and the truck to the Lincoln County Sheriff's office where he was subsequently interviewed by Sergeant Keesling, a Kansas Highway Patrol Officer assigned to the Kansas DEA drug task force.

Prior to this interview, Sergeant Keesling learned from Trooper DeVore that Mr. Pullen was wanted on an outstanding felony warrant from the State of Missouri. The officers testified that, although they contacted the agency issuing

[2] It appears that the first back-up officer at the scene was Kansas Highway Patrol Officer Lt. Ladner, who was escorting Kansas Governor William Graves to a state function. Both Governor Graves and Lt. Ladner testified at trial as to the reckless and dangerous manner in which Mr. Pullen had been driving.

the warrant in Missouri and received permission to continue with the controlled delivery before executing the warrant, they did not inform Mr. Pullen that they knew about the warrant.

Trooper DeVore and Sergeant Keesling both testified that Mr. Pullen refused to have the interview tape recorded, and although Mr. Pullen orally waived his *Miranda* rights, he refused to sign a written waiver form because he was frightened that if he signed anything, the others involved in the drug operation would find him and harm him. During the interview by Sergeant Keesling, Mr. Pullen again indicated his willingness to cooperate in a controlled delivery of the drugs to their intended destination in Illinois.

Once they reached Illinois, Mr. Pullen refused to place the necessary contact telephone calls unless the law enforcement officers agreed to allow him to make the delivery alone. Because the officers considered him under arrest on the outstanding warrant from Missouri, and because allowing him to proceed unescorted was not standard procedure, they refused to permit him to make the delivery without an officer with him. The controlled delivery was subsequently aborted, and Mr. Pullen was placed in state custody in Illinois. Sergeant Keesling testified that, after the operation was abandoned, Mr. Pullen told him he had no intention of going through with the delivery, but only wanted access to the truck by himself so he could escape.

It is unclear from the record exactly what transpired between the time Mr. Pullen was placed in state custody in Illinois on July 26, 1998, and the time he was indicted on the federal charges in Kansas on September 9, 1998. Because, however, Sergeant Keesling conducted another interview with Mr. Pullen in Missouri on September 10, 1998, in an attempt to gain additional information on the Illinois delivery, we can assume that Mr. Pullen was extradited from Illinois to Missouri on the outstanding warrant. Mr. Pullen was arrested on the federal charges on October 6, 1998, convicted on April 15, 1999, and sentenced on July 14, 1999.

Mr. Pullen brings his appeal pro se asserting that: (1) his transport from the State of Kansas to the State of Illinois, without a court proceeding, violated his pre-transfer rights under the Uniform Criminal Extradition Act (Extradition Act), 18 U.S.C. § 3182, codified in Kansas at Kan. Stat. Ann. §§ 22-2701 through 22-2730; (2) the trial court erred in denying his motion to dismiss his indictment; (3) he did not knowingly and intelligently waive his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966); (4) the trial court erred in its jury instruction advising the jury that they could consider the arguments of the attorneys; (5) he was denied effective assistance of trial counsel; and (6) he was denied his constitutional right to due process and a fair trial by the government's actions in allegedly "destroying, disposing of, concealing, suppressing and fabrication of

evidence, as well as using false statements, perjured testimony and tainted and fabricated evidence, and failure to disclose exculpatory evidence." Appellant's Initial Br. at ix. We will address each of Mr. Pullen's issues in turn.

## II. Discussion

### A. Violation of extradition rights–

Mr. Pullen asserts that his transport from Kansas to Illinois to assist in the controlled delivery was in violation of his rights under the Extradition Act.[3] The Extradition Act "establishes procedures for the interstate transfer of persons against whom criminal charges are outstanding." *Cuyler v. Adams*, 449 U.S. 433, 435 n.1 (1981). These rights are guaranteed in Article IV, § 2, cl.2, of the United States Constitution[4] and 18 U.S.C. § 3182.[5] "A prisoner transferred under the

---

[3]    The Uniform Criminal Extradition Act is codified in Kansas as Kan. Stat. Ann. §§ 22-2701 to 22-2730, and codified in Illinois as 725 Ill. Comp. Stat. 225/1 to 225/32.

[4]    Article IV, § 2, cl.2, provides:

A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

[5]    18 U.S.C. § 3182 provides:

(continued...)

Extradition Act is explicitly granted a right to a pretransfer 'hearing' at which he is informed of the receiving State's request for custody, his right to counsel, and his right to apply for a writ of habeas corpus challenging the custody request." *Cuyler*, 449 U.S. at 443.

Insofar as Mr. Pullen is arguing that he was not afforded these rights prior to being transported from Kansas to Illinois, his argument fails for several reasons. First, although it is not entirely clear from the record, it appears that Mr. Pullen was extradited from Illinois to Missouri after the controlled delivery plan was abandoned. It was at that time that he should have been afforded his pretransfer rights or challenged the extradition procedure if he was denied these rights. *See Gee v. State of Kansas*, 912 F.2d 414, 416 (10th Cir. 1990) ("Before

---

[5](...continued)

> Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the State or Territory from whence the person so charged has fled, the executive authority of the State, District, or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged.

a fugitive in custody is extradited to the demanding state, he may challenge the authority of the asylum state by seeking a federal writ of habeas corpus.") (*citing Michigan v. Doran*, 439 U.S. 282, 289 (1978)). Once Mr. Pullen was extradited to Missouri, however, the writ of habeas corpus was no longer available to challenge the extradition procedures of the asylum state. *See Gee*, 912 F.2d at 416.

Second, we have held that "the constitutional dimension of extradition exists only when demand is made by one jurisdiction for the surrender of a person in another jurisdiction." *Ortega v. City of Kansas City*, 875 F.2d 1497, 1499 (10th Cir. 1989). There was no evidence that either Missouri or Illinois made a demand on Kansas for Mr. Pullen's extradition. To the contrary, Sergeant Keesling testified that the issuing agent in Missouri was notified of Mr. Pullen's arrest and subsequently gave the DEA agent permission to proceed with the controlled delivery in Illinois.

We have no record indicating what procedures took place in Illinois before Mr. Pullen was returned to Missouri. What we do know is that, under the circumstances here, Mr. Pullen's argument that Kansas had a duty to provide him with Extradition Act pretransfer rights prior to transporting him to Illinois is without merit. *See Ortega*, 875 F.2d at 1500 ("[T]he Uniform Criminal

Extradition Act does not establish an *exclusive* procedure by which law enforcement officials may arrest non-residents.").

## B. Motion to dismiss indictment–

Next, Mr. Pullen claims that the district court erred in denying his pretrial motion to dismiss his indictment. Mr. Pullen contends that he was in federal custody from the time of his arrest in Kansas on July 25, 1998, but because he was not indicted on federal charges until September 9, 1998, forty-six days later, he was held in violation of the Speedy Trial Act, 18 U.S.C. §§ 3161 - 3174.

"The question of whether, or when, the actions of federal authorities trigger the time requirement of section 3161(b) is a question of law" which we review de novo. *United States v. Bagster*, 915 F.2d 607, 609 (10th Cir. 1990). The applicable provision of the Speedy Trial Act provides that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." § 3161(b).

We have held that "a person is not 'arrested in connection with' a charge, within the meaning of section 3161(b) of the Speedy Trial Act, unless there is some coincidence of (1) a pending federal complaint and (2) federal custody based on that complaint." *Bagster*, 915 F.2d at 611.

Mr. Pullen was arrested in Kansas by Kansas state troopers on state charges of various traffic violations. Once he indicated a willingness to cooperate with a controlled delivery of the drugs, these troopers were assisted by Sergeant Keesling, a member of the Kansas Highway Patrol assigned to the DEA task force in Kansas. Sergeant Keesling testified that when the controlled delivery was aborted, Mr. Pullen was placed in the custody of the State of Illinois for extradition proceedings in connection with the outstanding warrant from the State of Missouri. *See* R. Vol. 3 at 72. He further testified that he never told Mr. Pullen he was under arrest on federal charges and no decision regarding federal charges was made until Sergeant Keesling presented the case to the Kansas grand jury on September 9, 1998.

Contrary to Mr. Pullen's assertion, there was no federal complaint filed and no indication that Mr. Pullen was in federal custody until federal charges were filed on September 9, 1998. *See Bagster*, 915 F.2d at 611 n.2 (stating that filing of complaint and service of summons are predicates to running of time requirement of § 3161(b)). Following the filing of a formal complaint, Mr. Pullen was taken before a federal magistrate on October 6, 1998, well within the time requirements of the Speedy Trial Act. Therefore, we discern no error in the district court's denial of Mr. Pullen's motion to dismiss on Speedy Trial Act violations.

**C. Knowing and intelligent waiver of** *Miranda* **rights–**

Mr. Pullen asserts that his rights under *Miranda*, 384 U.S. at 469-73 (imposing upon law enforcement personnel the obligation to advise a suspect of the possible use of his statements against him in a criminal proceeding and of his right to have counsel present during interrogation), were not knowingly and intelligently waived. His various arguments on this issue, however, appear to be somewhat protean.

In his motion to suppress, Mr. Pullen stated that he had been given his *Miranda* rights at the scene of the Kansas arrest, *see* Supp. R. Vol. 1, doc. 37 at 2. He went on to argue that, because the police offered "assistance" in exchange for his cooperation, his statements were coerced; the delay of more than six hours in his arraignment mitigated against voluntariness; and his statements were protected as made in the course of plea negotiations. On appeal, Mr. Pullen appears to abandon most of these arguments and asserts that he was never given any *Miranda* warnings at all.

This assertion is belied by the testimony of the law enforcement officers at trial. Although Lt. Kindlesparger testified that he did not issue *Miranda* warnings to Mr. Pullen, Trooper DeVore testified at the motions hearing and at trial that when he arrived on the scene, he read Mr. Pullen the *Miranda* warnings from the card he carried. *See* R. Vol. 3 at 28, Vol. 4 at 173-74. At this point, Mr. Pullen

confessed that he was transporting the marijuana from Arizona to Illinois, and provided Trooper DeVore with details of the arrangement. Trooper DeVore then talked to Mr. Pullen about cooperating with a controlled delivery.

Later, prior to being interviewed by Sergeant Keesling, Mr. Pullen was presented with a "48-hour waiver and Miranda waiver." As explained by Sergeant Keesling, this form documents a defendant's understanding and waiver of his *Miranda* rights and also indicates that the defendant is cooperating with the DEA, is doing so with no promises concerning his cooperation other than informing the prosecution of the cooperation, and is waiving the right to be taken immediately before a judge. *Id.* Vol. 3 at 70-71. Although Sergeant Keesling testified that Mr. Pullen refused to sign the form out of fear of harm from his drug contacts in Illinois, he testified that Mr. Pullen orally agreed to the terms of the waiver form. *Id.* at 71. The form, which was introduced as evidence at Mr. Pullen's trial, was marked "Agreed but refused to sign" and witnessed by Sergeant Keesling and Trooper DeVore. *Id.*, Vol. 4 at 188-89.

"The ultimate question of whether a statement was voluntary is a question of law reviewed de novo." *United States v. Hernandez*, 93 F.3d 1493, 1501 (10th Cir. 1996). In *Moran v. Burbine*, 475 U.S. 412 (1986), the Supreme Court defined two "dimensions" of the Miranda inquiry as follows:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather

-12-

than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. at 421 ( *quoting Fare v. Michael C* ., 442 U.S. 707, 725 (1979)).

Mr. Pullen asserts that he was tricked into waiving his rights by officers who led him to believe that he was only under arrest for misdemeanors and who never informed him that he was under arrest on the felony drug violation. This assertion is refuted by the testimony of the police officers involved. First, Trooper DeVore testified that after he had initially read Mr. Pullen his *Miranda* rights, he volunteered information about where and to whom he was to deliver the marijuana in Illinois. Moreover, after Mr. Pullen was again advised of his *Miranda* rights by Sergeant Keesling, the entire substance of the interview concerned the drugs and the controlled delivery. *See United States v. Toro-Pelaez* , 107 F.3d 819, 825 (10th Cir. 1997) ("An express statement of waiver by the defendant is not required; instead, waiver can be inferred from the defendant's actions and words.") ( *citing North Carolina v. Butler* , 441 U.S. 369, 373 (1979))

After a hearing, the district court denied Mr. Pullen's motion to suppress. All of the testimony at the motions hearing and at trial supports the district

court's conclusion that Mr. Pullen was fully informed of his *Miranda* rights and knowingly and intelligently waived same. Mr. Pullen's assertions to the contrary are unsupported and without merit.

**D. Supplemental jury instruction–**

Next, Mr. Pullen claims that the trial court's response to a question from the jury during deliberations was erroneous and prejudiced his right to a fair trial.

During deliberations, the jury sent a question to the court asking: "Are we not to consider the fact that the Defendant possessed and had the knowledge that what he possessed was marijuana since both lawyers state that he possessed and knew of the marijuana in their closing statements?" R. Vol. 5 at 337. At a bench conference with both counsel and Mr. Pullen, Mr. Pullen's counsel suggested that the jury should be reminded to read the instructions already given, while the prosecutor said he would leave the answer to the discretion of the court. Thereafter the court instructed the jury that they were "at liberty to consider the evidence, the arguments and anything that will help [them] in [their] deliberations, including admissions made by parties through their attorneys." *Id.* at 340. There was no contemporaneous objection to this response.

Because Mr. Pullen did not timely object to the supplemental instruction, we can only review for an (1) "error," (2) that is "plain," and (3) that "affect[s]

substantial rights." Fed R. Crim P. 52(b); *see also United States v. Sides*, 944 F.2d 1554, 1562 (10th Cir. 1991) ("Failure to object to the jury charge in a timely and specific manner precludes appellate review, and the judgment will be reversed only if the trial court committed plain error.") (quotation omitted).

"'Plain errors' are those which are obvious and substantial, and which when viewed in light of the entire record seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Nall*, 949 F.2d 301, 309 (10th Cir. 1991) (citations omitted). "Only rarely will we reverse based on allegedly erroneous instructions to which there was no objection at trial; the party claiming plain error has the heavy burden of demonstrating fundamental injustice." *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 553 (10th Cir.), *cert. denied*, 120 S. Ct. 48 (1999) (quotation omitted).

In its initial charge to the jury the court issued an instruction which advised, *inter alia,* that "[s]tatements and arguments of counsel are not evidence in the case. When, however, the attorneys on both sides stipulate or agree as to the existence of a fact, the jury must, unless otherwise instructed, accept the stipulation and regard that fact as proved." R. Vol. 1, doc. 75, jury instruction #28.

Mr. Pullen attempts to persuade us that the trial court's response to the jury's question led to jury confusion or misunderstanding. Our reading of the

trial court's response, however, indicates that it was basically a reiteration of the court's previous instruction. The court's initial charge to the jury was correct and unchallenged, and we assume the jury was fully capable of understanding and following the court's instructions. *See United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992) ("We presume jurors will remain true to their oath and conscientiously follow the trial court's instructions."). Insofar as the response may have been inartfully worded or inconsistent, considering the overwhelming evidence presented establishing Mr. Pullen's possession of the marijuana, we determine that the response did not substantially influence or taint the jury's verdict. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (holding that in considering a claim under the plain error standard, the burden is on the defendant to establish that the forfeited error was prejudicial).

**E. Ineffective assistance of trial counsel–**

"Ineffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal. Such claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed." *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (*en banc*). This, however, is one of those rare cases where the claim was well developed by the district court and the record on appeal is so well documented, that this court will review

-16-

Mr. Pullen's claim on direct appeal. [6] *See United States v. Carter* 130 F.3d 1432, 1442 (10th Cir. 1997); *United States v. Gallegos*, 108 F.3d 1272, 1279-80 (10th Cir. 1997).

A claim of ineffective assistance of counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To establish ineffectiveness, Mr. Pullen must prove: (1) that counsel's performance "fell below an objective standard of reasonableness," and (2) that the deficient performance prejudiced the defense, which requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 687-88, 694; *see also Williams v. Taylor*, 120 S. Ct. 1495, 1511-12 (2000).

In his post-trial motion, Mr. Pullen provided the trial court with a list of witnesses that he claimed counsel refused to subpoena. We agree with the trial court's conclusion, however, that Mr. Pullen did not indicate what the substance of the testimony of these witnesses would be or how their testimony would have refuted the prosecution's evidence. We further agree with the trial court's determination that defense counsel's failure to present an "entrapment" theory

---

[6] Mr. Pullen raised the issue of ineffective assistance of defense counsel in his post-trial pro se motion for a judgment of acquittal or, in the alternative, for a new trial. In dismissing the motion, the district court thoroughly discussed Mr. Pullen's claims and found that he had not received ineffective assistance. *See* R. Vol. 1, doc. 87 at 8-14.

was not error in that Mr. Pullen offered no evidence to support such a theory. Noting that Mr. Pullen's trial counsel was his third attorney appointed only one month before trial, the court analyzed Mr. Pullen's complaint that counsel did not spend enough time with him and found that, under the circumstances, counsel's meetings and written correspondence with Mr. Pullen were adequate. Mr. Pullen does not persuasively challenge these findings on appeal.

Mr. Pullen claimed to the trial court and on appeal that his counsel failed to object to tainted, false, misleading, and altered testimony by the various law enforcement witnesses. In his motion to the trial court, as well as on appeal, these claims are presented as general, conclusory allegations with no specific description of the testimony or evidence to which his attorney should have objected.

Mr. Pullen asserts that his counsel "lied" to him in an attempt to convince him to enter into a plea agreement. Once again, he did not inform the court as to the nature of these lies or how they served to prejudice his trial.

During closing statements, Mr. Pullen's counsel commented that there was very little doubt that Mr. Pullen had possession and knowledge of the marijuana. He then concentrated his argument on the premise that the prosecution failed to prove that Mr. Pullen intended to distribute the drug. To the extent Mr. Pullen argues that his defense counsel was ineffective because he admitted that

Mr. Pullen was guilty of possession in his closing argument, we recognize that this conduct can "represent[] a pardigmatic example of the sort of breakdown in the adversarial process that triggers a presumption of prejudice." *United States v. Williamson*, 53 F.3d 1500, 1510 (10th Cir. 1995). In viewing the evidence against Mr. Pullen "from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, however, we determine that counsel's strategic decision to "winnow[] out weaker arguments" in favor of "focusing on one central issue," is an acceptable exercise in professional judgment. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983); *see also Williamson*, 53 F.3d at 1512 (holding that counsel's strategy of conceding guilt to lesser charge, while arguing for acquittal on major charge, did not constitute ineffective assistance). Moreover, our own review of the transcript demonstrates that counsel's closing argument is replete with attempts to fortify and advocate for Mr. Pullen's interests. Therefore, we agree with the trial court that the strength of the government's case against Mr. Pullen is more than ample to overcome any presumption of prejudice.

In his appellate brief, Mr. Pullen lists twenty-four different acts by defense counsel which he asserts denied him effective assistance. Underlying a majority of Mr. Pullen's complaints is the theme that defense counsel did not do all of the things that Mr. Pullen instructed him to do. We have held that "[c]ounsel does not have to take every position and make every argument that the client requests."

*United States v. Boigegrain*, 155 F.3d 1181, 1187 (10th Cir. 1988); *see also*

*United States v. Dawes*, 874 F.2d 746, 748 (10th Cir. 1989) (per curiam) ("There

is no right to counsel who will blindly follow a defendant's instructions."),

*overruled on other grounds by United States v. Allen*, 895 F.2d 1577 (10th Cir.

1990).  Here, Mr. Pullen did not provide adequate support for his premise that the

result of his trial would have been different if defense counsel had taken any of

the alleged omitted or refused actions.  We agree with the trial court that defense

counsel's performance did not fall below a reasonable standard, and therefore,

Mr. Pullen did not meet his burden of proof as to his claims of ineffective

assistance of counsel.


## F.  Destruction of exculpatory evidence–

Finally, Mr. Pullen alleges that the government destroyed, concealed, and

suppressed exculpatory evidence and presented tainted, false, and perjured

testimony in order to convict him.  Mr. Pullen argues that the government

destroyed evidence of an "operation" being conducted prior to Mr. Pullen's arrest

and concealed "recording devices" that were inside the truck that Mr. Pullen was

driving.  Appellant's Initial Br. at 80-81.  Mr. Pullen does not identify this

"operation" or these "recording devices" with any specificity, but appears to make

his argument amid a general claim that he was the victim of a conspiracy involving

-20-

law enforcement personnel, both state and federal in three states, the prosecutor, and the courts. In rejecting these arguments in Mr. Pullen's post-trial motion, the trial court considered Mr. Pullen's allegations conclusory--without support either factually or legally. We agree.

### III. Conclusion

Following a careful review of the trial transcripts, the record on appeal, and the parties briefs, we find no reversible error in Mr. Pullen's trial. Therefore, Mr. Pullen's conviction and sentence are AFFIRMED.

Entered for the Court

John C. Porfilio
Circuit Judge